**POTASH CO. OF AMERICA**

v.

**INTERNATIONAL MINERALS & CHEMICAL CORP.**

No. 4678.

United States Court of Appeals
Tenth Circuit.

May 15, 1954.

Rehearing Denied July 3, 1954.

James P. Hume, Chicago, Ill. (Patrick H. Hume, Washington, D. C., W. A. McGrew, Mason A. Lewis, Denver, Colo.,

and Roy H. Blackman, Jr., Carlsbad, New Mexico, on the brief), for appellant.

Charles H. Walker, New York City (Maxwell Barus, Henry J. Zafian, of Fish, Richardson & Neave, New York City, Cyril A. Soans, Francis A. Even, of Soans, Glaister & Anderson, Chicago, Ill., Morrison Shafroth, of Grant, Shafroth and Toll, Denver, Colo., and Caswell S. Neal, of Neal, Neumann and Neal, Carlsbad, New Mexico, on the brief), for appellee.

Before HUXMAN, MURRAH and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

Potash Company of America[1] was the owner of patents No. 2,046,312 (Anderson Reissue 21,566), Weinig 2,105,294 and Weinig 2,188,932. All three patents relate to various aspects of froth flotation processes for separating sylvite from potash bearing ore known as "sylvinite". The Anderson reissue patent is wholly devoted to this method, while the Weinig patents combine the process with a heat cycle method. The Anderson patent was issued July 7, 1936, and the Weinig patents, which were improvements on the Anderson patent, were issued a short time thereafter. This action was brought to enjoin alleged infringement of the three patents and for an accounting. The defense was invalidity, noninfringement and laches. After a trial on all the issues, the trial court held that the patents were valid and infringed but denied relief because of laches. We have carefully examined the voluminous record and concluded that the judgment must be affirmed.

On the question of laches, there are well-settled applicable rules of law. The rule is applicable in patent cases. Lukens Steel Co. v. American Locomotive Co., 2 Cir., 197 F.2d 939; Brennan v. Hawley Products Co., 7 Cir., 182 F.2d 945, certiorari denied 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 631; Shaffer v. Rector Well Equipment Co., Inc., 5 Cir., 155 F.2d 344; Pollitzer v. Foster, 6 Cir., 59 F.2d 901; Dwight & Lloyd Sintering Co., Inc., v. Greenawalt, 2 Cir., 27 F.2d 823; A. R. Mosler & Co. v. Lurie, 2 Cir., 209 F. 364; Walker on Patents, Vol. 4, p. 2658. To constitute laches two elements must exist: first, inexcusable delay in instituting suit and second, prejudice resulting to the defendant from such delay. The existence of laches does not depend merely upon the lapse of time, but also upon the equities presented in the case. Pfister v. Cow Gulch Oil Co., 10 Cir., 189 F.2d 311, certiorari denied 342 U.S. 887, 72 S.Ct. 177, 96 L.Ed. 665; Rome Grader & Machinery Corp. v. J. D. Adams Mfg. Co., 7 Cir., 135 F.2d 617; Hoehn v. Crews, 10 Cir., 144 F.2d 665, 671, affirmed Garber v. Crews, 324 U.S. 200, 65 S.Ct. 600, 89 L.Ed. 870.[2] In the latter case we said, "No absolute rule can be laid down by

1. The parties hereto will be referred to as "plaintiff" and "defendant" as in the court below.

2. In Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743, the Supreme Court said:
   "Traditionally and for good reasons, statutes of limitation are not controlling measures of equitable relief. Such statutes have been drawn upon by equity solely for the light they may shed in determining that which is decisive for the chancellor's intervention, namely, whether the plaintiff has inexcusably slept on his rights so as to make a decree against the defendant unfair. See Russell v. Todd, supra, 309 U.S. [280] at page 289, 60 S.Ct. [527] at page 532, 84 L.Ed. 754. 'There must be conscience, good faith, and reasonable diligence, to call into action the powers of the court.' McKnight v. Taylor, 1 How. 161, 168, 11 L.Ed. 86. A federal court may not be bound by a State statute of limitation and yet that court may dismiss a suit where the plaintiffs' lack of diligence is wholly unexcused; and both the nature of the claim and the situation of the parties was such as to call for diligence * * *.' Benedict v. City of New York, 250 U.S. 321, 328, 39 S.Ct. 476, 478, 63 L.Ed. 1005. A suit in equity may fail though 'not barred by the act of limitations * * *.' McKnight v. Taylor, supra; Alsop v. Riker, 155 U.S. 448, 15 S.Ct. 162, 39 L.Ed. 218.
   "Equity eschews mechanical rules; it depends on flexibility. Equity has acted on the principle that 'laches is not, like

which to determine what constitutes laches or staleness of demand. Each case must be determined according to its own peculiar circumstances. Since laches is an equitable doctrine, its application is controlled by equitable considerations. It cannot be invoked to defeat justice and will be applied as a defense only where the enforcement of the asserted right would work injustice." [3]

Generally, the question of laches is addressed to the sound discretion of the trial judge. Gardner v. Panama R. Co., 342 U.S. 29, 72 S.Ct. 12, 96 L.Ed. 31; Lansdale v. Smith, 106 U.S. 391, 1 S.Ct. 350, 27 L.Ed. 219; Laursen v. O'Brien, 7 Cir., 90 F.2d 792; Gillons v. Shell Co. of Calif., 9 Cir., 86 F.2d 600, certiorari denied 302 U.S. 89, 58 S.Ct. 9, 82 L.Ed. 532; 30 C.J.S., Equity, § 115.

Laches will not be imputed to one who has been justifiably ignorant of facts which create his right or cause of action. Chisholm v. House, 10 Cir., 183 F.2d 698; Lawson v. Haynes, 10 Cir., 170 F.2d 741; Alexander v. Phillips Petroleum Co., 10 Cir., 130 F.2d 593; Central Ry. Signal Co. v. Longden, 7 Cir., 194 F.2d 310. But ignorance will not of itself excuse delay. The party must be diligent and make such inquiry and investigation as the circumstances reasonably suggest, and the means of knowledge are generally equivalent to actual knowledge. Baker v. Cummings, 169 U.S. 189, 18 S.Ct. 367, 42 L.Ed. 711; City of New Albany v. Burke, 11 Wall. 96, 78 U.S. 96, 20 L.Ed. 155; Mount Vernon Sav. Bank v. Wardman, 84 U.S.D.C. App. 343, 173 F.2d 648; Winn v. Shugart, 10 Cir., 112 F.2d 617. If the party which advances the defense of laches is responsible for the delay or contributes substantially to it he cannot take advantage of it. Then, too, if material facts are concealed or misrepresented by a suspected wrongdoer, and if in reliance thereon the person wronged is deceived and his suspicions allayed for awhile, a court of equity will not grant the wrongdoer any advantage resulting from the lapse of time. Saulsbury Oil Co. v. Phillips Petroleum Co., 10 Cir., 142 F.2d 27, 40, certiorari denied 323 U.S. 727, 65 S.Ct. 62, 89 L.Ed. 584; Merritt Oil Corp. v. Young, 10 Cir., 43 F.2d 27; York v. Guaranty Trust Co. of N. Y., 2 Cir., 143 F.2d 503, reversed on other grounds 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079; Spiller v. St. Louis & S. F. R. Co., 8 Cir., 14 F.2d 284, affirmed in part and reversed in part 274 U.S. 304, 47 S.Ct. 635, 71 L.Ed. 1060.

---

limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties.' Galliher v. Cadwell, 145 U.S. 368, 373, 12 S.Ct. 873, 875, 36 L. Ed. 738; see Southern Pacific Co. v. Bogert, 250 U.S. 483, 488–489, 39 S.Ct. 533, 535, 536, 63 L.Ed. 1099. And so, a suit in equity may lie though a comparable cause of action at law would be barred. If want of due diligence by the plaintiff may make it unfair to pursue the defendant, fraudulent conduct on the part of the defendant may have prevented the plaintiff from being diligent and may make it unfair to bar appeal to equity because of mere lapse of time."

3. In its conclusions of law, the trial court, with unusual clarity, announced the equitable rule as follows:

"The constituent elements of laches are neglect or delay for an unreasonable length of time in the assertion of a right under circumstances which permit diligence, and disadvantage to the other party which would not exist if the right had been asserted with reasonable diligence. The doctrine is based in part on the injustice which may result from the enforcement of long-neglected rights, due to the difficulty or impossibility of ascertaining the truth of the matters in controversy and doing justice between the parties. It is an equitable doctrine, controlled by equitable considerations; and under the doctrine, where a court of equity finds that during neglect or delay for an unreasonable length of time in the assertion of a right, the position of the parties has so changed that equitable relief cannot be afforded without doing injustice, it will not exert its equitable powers in order to save one from the consequences of his own neglect or delay." "

From the foregoing rules, it appears that the doctrine of laches is a matter of balancing equities between parties. In patent cases it is inequitable for an infringer to deprive the owner of a patent of royalties and other rights which the patent affords. It is equally inequitable for the patent owner to sleep on his rights and lead an infringer to make large investments in the belief that he is not infringing or that the patent rights are not to be pressed. Rome Grader & Mach. Corp. v. J. D. Adams Mfg. Co., supra; Westco-Chippewa Pump Co. v. Delaware Electric & Supply Co., 3 Cir., 64 F.2d 185; Pollitzer v. Foster, supra; Dwight & Lloyd Sintering Co., Inc., v. Greenawalt, supra; Wolf, Sayer & Heller, Inc., v. United States Slicing Mach. Co., 7 Cir., 261 F. 195; A. R. Mosler & Co. v. Lurie, supra. With this background of law, we shall consider the facts upon which the trial court reached its decision.

The trial court in its findings of fact detailed the relations of the parties and their negotiations relating to infringement upon which it based its conclusion that plaintiff was barred from recovery because of laches.[4] The plaintiff con-

4. These findings are:
"Late in 1939 and early in 1940, plaintiff brought to the attention of Union Potash & Chemical Company, predecessor of defendant, the original Anderson patent No. 2,046,312, Weinig patent 294, and Weinig patent 932. At that time, Union had not commenced commercial operations at its plant near Carlsbad. Plaintiff was informed that Union did not think its contemplated operations were within the scope of such patents. On May 16, 1940, a conference was held in Carlsbad between representatives of Union and representatives of plaintiff. Plaintiff knew at that time that Union contemplated the use of amine as a reagent to float potassium chloride, and it was advised that Union denied that such proposed use of amine would constitute infringement of any or all of such patents. At the request of plaintiff, a further conference was held in Chicago on September 24, 1940. In the course of that conference plaintiff asserted re-issue patent 566 against Union's use of amines in its process of refining sylvinite ore; and Union denied that its process would constitute infringement of the re-issue patent. Plaintiff pressed for an inspection of Union's plant to be held after operations had commenced in order to determine the applicability of Anderson re-issue patent 566, Weinig patent 294, and Weinig patent 932. On July 14, 1941, plaintiff again requested an inspection of Union's refining plant and was informed that the request would have to be referred to officials in New York. On August 21, 1941, Union suggested deferring the inspection for sixty days to prevent disclosure of a new technique being tried out. Plaintiff acceded to the suggestion, but on December 10, 1941, it again raised the question of an inspection. There-

after, the then president of plaintiff was conducted through Union's refinery; and on February 26, 1942, he wrote the then president of Union congratulating him on Union's accomplishments and extending an invitation for a reciprocal visit to plaintiff's refinery. Plaintiff made no further assertion of infringement of its patents until May, 1947, when it pressed for further inspection of the refinery, then owned by defendant; and it stated for the first time that it had merely deferred the matter during the war. Correspondence followed in which plaintiff asserted that defendant's operations impinged upon its patents. On October 15, 1948, representatives of plaintiff inspected defendant's refinery, measured temperatures, and took samples at various points throughout the process. On January 24, 1949, plaintiff submitted to defendant a written report and findings based upon the inspection of October 15, 1948. It was stated in the report and findings among other things that the process being used by defendant in its refining of sylvinite ore infringed the three patents presently in controversy. Plaintiff requested a further inspection; it was had on September 28, 1950; and during its course, representatives of plaintiff observed the operation, measured temperatures, and took samples at various junctures in the process.

"Plaintiff knew at all times material here that inspection or inspections of defendant's plant in operation was or were reasonably necessary to enable plaintiff to obtain the information needed to determine with a fair measure of basis whether defendant's process infringed either or both of the Weinig patents. But the conferences and the inspections were not necessary in order for plaintiff to ascertain whether such process in-

cedes that these findings are correct, but contends that the court erred in failing to take into account additional significant and controlling facts. It argues that the evidence shows that the delay in bringing action was occasioned by the defendant's conduct in not permitting a promised inspection of the defendant's plant and the intervention of World War II. In other words, it is claimed that the delay was brought about by the conduct of the defendant and the war, and was not due to the lack of diligence by the plaintiff.

At the outset it should be stated that the Anderson patent has now expired and that the plaintiff withdrew the charge of infringement of the Weinig patents subsequent to March, 1950.[5] For all practical purposes, an accounting is the only relief to which the plaintiff would be entitled.

Potash is used principally for commercial fertilizer and is found in beds containing sylvinite ore near Carlsbad, New Mexico. These beds are the only ones thus far discovered in the United States which have been developed commercially. Sylvinite ore is essentially a mixture of two salts, potassium chloride and sodium chloride, together with other unimportant substances. The potassium chloride is known to the industry as "sylvite", and the sodium chloride as "halite". Sylvite is the desired potash and halite is ordinary salt.

The plaintiff put its commercial plant into operation in the latter part of 1935. In refining the ore, the flotation process defined in the Anderson patent, together with the improvement of the Weinig patents, was used. The improvement taught by the Weinig patents is a temperature control of the solution during the flotation process. Sometime in 1939, the Union Potash Company, the defendant's predecessor, gave consideration to entering the potash field at Carlsbad. It concluded that it would use a froth flotation separation method employing an amine reagent for floating the sylvite. Although defendant's process was to be somewhat different[6] plaintiff believed from the very beginning that no successful froth flotation method could be suc-

fringed the Anderson reissue patent 566. Plaintiff knew at all times since operation of the plant began in 1940 that amine was being used as a reagent to float sylvite from sylvinite ore; and although having such knowledge, plaintiff did not institute this action until May 10, 1951.

"During the time intervening after plaintiff learned that in the operation of the refinery in question amine was being used as a reagent to float sylvite from sylvinite ore and prior to the institution of this action, Union Potash Company and its successor, defendant, expanded the refinery and its related facilities, increased approximately three-fold the annual output of ore treated by flotation, and made capital investments aggregating several million dollars. During such interim, John T. Burrows, president of Union Potash Company; G. W. Harris, first president of plaintiff; G. J. Rollandet, to whom reference has been made; J. B. Grant, an attorney for plaintiff; and R. G. O'Meara, one of the technicians at Rolla, to whom reference has been made, died. L. D. Anderson, the patentee in patent No. 2,046,312, and re-issue patent 566, died shortly after the institution of the action. These persons, in the aggre- gate, not each singly, were acquainted with facts and circumstances attending and surrounding the Anderson inventions, with the relations between Union Potash & Chemical Company and plaintiff, with the relations between the Bureau of Mines and plaintiff, and with the early operations of the refinery now owned by defendant; and their deaths made unavailable testimony which would have been pertinent to the issues joined and now before the court for determination. And during such interim, certain laboratory records of the Bureau of Mines at Rolla were destroyed by fire, some of which may have borne upon the tests and experiments conducted pursuant to the cooperative contracts into which the Bureau of Mines and plaintiff entered."

5. The trial court found that: "At the beginning of the trial plaintiff withdrew or abandoned the charge of infringement of Weinig 294, and Weinig 932, subsequent to March, 1950."

6. Plaintiff's process floated the halite by using a soaplike reagent while defendant's process floated the sylvite with amines as a reagent.

cessfully used without infringing its patents. It so advised the defendant in 1939, while defendant's plant was under construction, and it furnished copies of the patents to the defendant. In May of 1940, a conference on patent matters was held between technicians of the plaintiff and defendant at Carlsbad. It was explained to representatives of the plaintiff that the defendant's contemplated process would use an amine reagent to float the sylvite and that, contrary to plaintiff's position, this process would not constitute an infringement of the Anderson patent. In September of 1940, a conference was had at Chicago between the patent attorneys of the two companies and other representatives. All the patents in suit were discussed and the defendant's use of amines in its flotation process was disclosed at that time. Representatives of the defendant stated at this meeting that its process would not use temperature control, but representatives of the plaintiff were then of the view that any flotation method without temperature control, as taught by the Weinig patents, would be unsuccessful. At this last meeting it became apparent that no solution to the patent disputes, particularly those growing out of the Weinig patents, could be settled until after the defendant's plant began operations and representatives of the plaintiff had an opportunity to inspect its operations.[7]

In July, 1941, about eight months after the commencement of defendant's commercial operations, G. F. Coope, president of the plaintiff, wrote to John T. Burrows, president of the defendant, suggesting an inspection. Burrows asked that the matter be deferred to permit him to consult with his associates. In August, 1941, Burrows wrote to Coope and stated that his company was developing a new technique in the concentration section of its plant and that he preferred that an inspection be delayed until a regular procedure had been settled. He indicated that he believed a final settlement on such a method would take sixty days. On December 10, 1941, Coope again wrote to Burrows concerning the inspection. On February 27, 1942, Burrows wrote and informed Coope that he had been ill in Florida, which accounted for his delay in answering Coope's last letter. He said that he would return to his desk within three weeks, at which time the discussions would be promptly resumed where they had been terminated. In the meantime, Coope, at the invitation of defendant's manager, had visited the defendant's plant with another mining engineer and made a trip through it. He wrote Burrows to thank him for the opportunity to visit the plant and to congratulate him and his organization on the accomplishments to date. On March 5, 1942, Burrows wrote to Coope and said that he expected to be back on the job soon and hoped to see him on his first visit to the mine. Referring to Coope's visit to defendant's plant, he said, "We greatly appreciate your complimentary remarks on our operations, and hope that you will visit us whenever you can." Following this letter, there was no mention of the subject of an inspection or infringement until May of 1947, although the refineries were located in a desert country within a few miles of each other and there were conferences between representatives of the parties relating to production and labor problems. Coope also testified that he had visited defendant's plant at other times than in February, 1942. During the period after the discontinuance of inspection discussions, the defendant expanded its plant very rapidly. Its production increased many times and the yearly plant investment was not less than One Million ($1,000,000.00) Dollars.

In May, 1947, the subject of infringement was again brought to the attention of the defendant. Burrows had died and he was succeeded by Louis Ware. On

7. Defendant's claim that its process did not infringe any of the patents in suit was fortified by the opinions of technical experts and patent attorneys.

May 7, 1947, Ware wrote to Coope stating that he was surprised that the subject of infringement had again been raised. He said that he thought it had been agreed by all that there was no infringement and requested information as to what the plaintiff desired. Coope answered, reviewed the history of the patent discussions up to the time that they were discontinued in 1942, and requested an inspection of defendant's plant. After some intervening correspondence, an inspection by experienced personnel of the plaintiff was had on October 15, 1948. In January, 1949, plaintiff's patent attorneys advised that the inspection had disclosed that the defendant was using the temperature control features of the Weinig patents in violation thereof, and also that the flotation method used by the defendant was an infringement of the Anderson reissue patent. There was some correspondence between the parties relating to this report and the defendant, still hoping to convince the plaintiff that there was no infringement, requested that another inspection be made. There was another inspection on September 28, 1950, and this action was started on May 10, 1951, approximately eleven years after the first conference on patent matters.

Plaintiff argues strenuously that the evidence shows conclusively that the defendant's conduct lulled the plaintiff into a delay in seeking an inspection. It says the defendant made misrepresentations as to its process and denied that it used temperature controls in its process, and that the defendant was deliberately delaying an inspection when it knew all the time that the plaintiff was waiting for one. The plaintiff implies that this conduct was sinister and deceitful to such an extent that the delay which resulted therefrom cannot be relied upon by the defendant. The plaintiff further says that when an inspection was permitted in October, 1948, it was under such regulation and restraint that the defendant revealed only information which it knew was inadequate. We find nothing in the record to indicate such wanton or reprehensible conduct on the part of the defendant which would excuse the plaintiff from exercising diligence in the prosecution of its claims, or that defendant's conduct had anything to do with plaintiff's decision not to press for an inspection. Even before the defendant had its plant in operation the plaintiff maintained that defendant's contemplated process would be an infringement of the patents in suit. At the Chicago meeting in 1940, Weinig advised representatives of the defendant that for a satisfactory recovery, the temperature control of the type covered by his patents would be required. From the beginning of the discussions in 1939 until early in 1942, defendant's position as to infringement had not changed and the plaintiff, long after the statements of the defendant relating to the use of temperature controls, was persistent in its request for an inspection. The reasons given by the defendant for delaying the inspection up to that time seemed to be reasonable and were so accepted by the plaintiff.[8]

Substantially all of the negotiations for an inspection were carried on between Coope, representing the plaintiff, and Burrows, representing the defendant. Coope, an experienced engineer, had an opportunity to go through the defendant's plant early in 1942. Burrows at that time was convalescing in Florida. His last letter to Coope indicated that the parties would arrange for an inspection upon his return. This letter was written before Burrows knew that Coope had visited the defendant's plant. Upon Burrows' return, there

---

8. After the defendant discovered that the Anderson patent had been re-issued narrowing its claims, the plaintiff seemed to recede somewhat from its first position that defendant's use of an amine reagent would infringe the Anderson patent. The plaintiff knew from the time of the 1940 meeting that an infringement of the Anderson patent would depend upon defendant's use of amines. It needed no inspection to determine this feature of its claim and the trial court so found.

were no further requests for an inspection. Although Coope's visit was not for the purpose of making an inspection, as had been previously contemplated, when the matter was so abruptly terminated by the plaintiff following the visit, the defendant was justified in concluding that the plaintiff was convinced that there was no infringement or that it did not intend to press its claims further. As to the 1948 inspection, plaintiff's representatives took temperature readings and samples. They made observations at desired places in the refinery. They were not furnished with a flow sheet giving full details of defendant's apparatus but they did have a schematic flow diagram illustrating all significant steps in defendant's process. They received enough information to prepare a reasonably accurate quantitive estimate of defendant's process and to conclude that there was an infringement of all patents in suit, and to determine the consequent damages.

Plaintiff urges that it did not continue its efforts to secure an inspection because of the circumstances of war and its public duty to further the war effort. It relies upon the rule that delay in bringing a patent infringement suit is excused during war time on the ground that public duty demands such forbearance. Alliance Securities Co. v. De Vilbiss Mfg. Co., 6 Cir., 41 F.2d 668; Mills Novelty Co. v. Monarch Tool & Mfg. Co., 6 Cir., 49 F.2d 28, certiorari denied 284 U.S. 662, 52 S.Ct. 37, 76 L. Ed. 561; Harries v. Air King Products Co., Inc., D.C.E.D.N.Y., 87 F.Supp. 572, affirmed 2 Cir., 183 F.2d 158. This would appear to be a salutary rule in a proper case, but here the plaintiff is asking to be excused for delaying an inspection to determine if there was an infringement, not to be excused for failure to institute suit. The necessary inspection was a comparatively simple matter, and would have taken the time of a very few technicians for about one day. Such an inspection would not have affected the production of either party, and the defendant would have known that the plaintiff had not abandoned its infringement claims. As it was, the plaintiff said and did nothing until May, 1947, almost two years after the war was over, and did not start suit until 1951. In the meantime, the memory of witnesses had been dulled, many had died, and documents which may have had a bearing on the validity of the patents had been destroyed. The trial court concluded that, "Due to plaintiff's delay for approximately ten years in the institution of this action after infringement of its patents began at the refinery near Carlsbad now owned and operated by defendant; due to plaintiff's complete silence for approximately five years—from 1942 to 1947—in respect to such infringement; due to defendant's heavy capital investments in its refinery and related facilities after infringement of the patents in controversy began and prior to the institution of this action; due to the death of persons who could have testified in respect to material facts and circumstances relating to material matters in the case; due to the destruction by fire of records which may have borne materially upon material matters in the case; and due to the death of L. D. Anderson shortly after the institution of the action, considered in their totality, the position of the parties has changed in such manner and to such extent that it would be inequitable to enjoin the defendant from continuing to float sylvite from sylvinite ore by the use of the amine being used or any similar reagent; and it would also be inequitable to allow plaintiff to recover damages for past infringement of its patents in the operation of defendant's refinery. Plaintiff delayed for an unreasonable length of time the institution of this action, under circumstances which permitted reasonable diligence; the position of the defendant was changed during the delay; the doctrine of laches is applicable; and appropriate

application of such doctrine precludes plaintiff from recovering."

We cannot say from this record that the learned trial judge erred or that he abused his discretion in holding that, the plaintiff did not exercise diligence in pressing its claims and that it would now be inequitable to grant the relief prayed for.

Judgment affirmed.