Olaf SOOT, Plaintiff,

v.

GENERAL ELECTRIC COMPANY, Defendant.

No. 85 Civ. 6492 (JMC).

United States District Court, S.D. New York.

Dec. 10, 1987.

John M. Calimafde, Francis J. Murphy, Dimitrios T. Drivas, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, for plaintiff.

Albert E. Fey, C. Joseph Laughon, II, Fish & Neave, New York City, for defendant.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Defendant's motion for summary judgment with respect to the issues of laches, barring plaintiff from seeking or recovering damages for alleged infringement prior to the commencement of this action, is granted. Fed.R.Civ.P. 56.

## BACKGROUND

Plaintiff Olaf Soot, a consulting engineer, holds U.S. Patent 4,034,227, filed on February 2, 1976 and issued to Soot on July 5, 1977 [the "227 Patent"], and U.S. Patent 4,088,897, filed on January 19, 1977 and issued to Soot on May 9, 1978 [the "897 Patent"] [collectively the "Soot Patents"]. The Soot Patents relate generally to a high density nuclear fuel storage rack used in nuclear reactors. The rack is comprised of a number of elongated, rectangular tubes joined at the corners to form a checkerboard pattern. On August 19, 1985, Soot filed suit against General Electric Company ["GE"], alleging infringement of the Soot Patents.

Nuclear reactors produce electric power by creating a sustained nuclear reaction through the interaction of different nuclear fuels. During the nuclear reaction, the nuclear fuels are burned, a process that generates tremendous heat, which is then converted into electricity. A nuclear reactor plant must contain adequate facilities to store the nuclear fuel, both prior to and following its use in the reactor core.

In the mid–1970s, the nuclear power industry began developing nuclear fuel storage racks that could be placed closer to one another, in order to more efficiently utilize available space. These came to be known in the industry as "high density" storage racks. At about this time, GE was developing various versions of high density storage racks. In 1976, GE learned of the development by Brooks & Perkins, a Michigan company ["B & P"], of a prefabricated rectangular tube that could be assembled into fuel storage racks, and into which could be inserted nuclear fuel ["B & P tubes"].

In May 1977, E.A. Grimm and L.L. Zahn of GE, and R.C. Karzmar of B & P completed a paper detailing the design of high density spent fuel storage systems, and discussing both GE's storage rack design and B & P's rectangular tube design. The paper, entitled "High Density Fuel Storage For Boiling Water Reactors," was presented at the June 12–16, 1977 Annual Meeting of the American Nuclear Society, in New York [the "GE–ANS Paper"]. On the same day that the GE–ANS Paper was presented, another paper, written by Soot, Alexander McPhee and Gunnar Harstead, entitled "Dry Spent Fuel Cask Handling System," was also presented [the "Soot–ANS Paper"]. Soot and Harstead were business associates and had their own consulting company, Soot & Harstead Associates, P.C. ["SHA"]. Soot and Harstead did not attend the session at which the GE–ANS and Soot–ANS Papers were presented.

Also in June 1977, GE entered into an agreement with the Northern States Power Company ["NSP"] to replace the existing fuel storage racks at NSP's nuclear reactor in Monticello with GE's high density storage rack utilizing B & P tubes. Because this represented a significant modification at the Monticello facility, the Nuclear Regulatory Commission ["NRC"] required NSP, as operator of the facility, to submit a report describing the proposed modification. In August, NSP submitted a "Design Report And Safety Evaluation For Replacement of Spent Fuel Pool Storage Racks" at the Monticello facility.

In mid-July 1977, the Leslie & Elliott Company of New Jersey, submitted to the Tennessee Valley Authority ["TVA"], a Technical Proposal for "Spent Fuel Storage Racks" for the TVA's Watts Bar nuclear facilities [the "TVA Proposal"]. The TVA Proposal contained the contributions of SHA, Soot's and Harstead's consulting company, and the S.M. Stoller Corporation ["Stoller"]. The Proposal described how the high density storage rack design proposed for the Watts Bar facilities had been developed by Stoller and SHA, and was based on the utilization of B & P's contain-

er tube design. The Proposal went on to mention the fact that other storage rack suppliers planned to utilize the B & P tubes, and specifically noted the GE–ANS Paper as describing one such application for high density storage racks, then pending before the NRC.

GE first learned of the Soot Patents between May and June 1978. In October, following consideration, GE concluded that its storage rack design did not infringe any claims of the Soot Patents and that the patents were probably invalid in light of earlier patents held by GE. Accordingly, GE decided to take no further action with regard to the Soot Patents and proceeded to construct and install high density storage racks for the TVA's Browns Ferry, the Georgia Power Company's Hatch, and the Carolina Power & Light Company's Brunswick nuclear facilities, among others.

In early 1983, an SHA employee conducted a search of the NRC's Public Document Room. Based on the results of this search, Soot obtained and reviewed NSP's August 1977 submission to the NRC regarding GE's installation of high density storage racks at the Monticello facility. Soot also reviewed additional NRC submissions concerning other facilities utilizing GE's storage rack system, as well as a November 1977 GE report entitled "Design Report And Safety Evaluation For High Density Fuel Storage System." On June 30, Soot's attorney wrote to the President of GE and offered a nonexclusive license under the Soot Patents. Correspondence between Soot's attorney and GE continued until July 1984, at which time GE expressed doubts about the validity of the Soot Patents and declared that it had no interest in pursuing licensing discussions. Approximately eleven months later, on August 19, 1985, Soot commenced this action for infringement. Following the completion of discovery, GE brought the instant motion for summary judgment.

## DISCUSSION

In addition to the motion for summary judgment, Soot has moved to strike four affidavits and arguments based upon them that were offered in reply to Soot's opposition to, and in further support of, GE's motion. The Court shall first address Soot's motion to strike.

## I. SOOT'S MOTION TO STRIKE

On January 20, 1987, GE filed its motion for summary judgment. By stipulation, Soot's opposition papers were due on February 20. On February 19, GE deposed Gunnar Harstead, Soot's partner in SHA and a co-author of the Soot–ANS Paper. On February 20, Soot filed its opposition to GE's motion. On February 26, Soot filed a supplemental memorandum, along with affidavits from Soot and Harstead, in which they state that they had not attended the June 1977 ANS meeting, were unaware of the presentation of the GE–ANS Paper at the same session at which the Soot–ANS Paper was presented and that it had not been necessary for either of them to be present at the ANS session for their paper to be delivered.

Also on February 26, GE submitted its reply to Soot's opposition to the motion for summary judgment. On March 2, Soot filed a motion to strike those portions of GE's reply papers that dealt with GE's efforts to publicize its high density storage racks, claiming that the discussion raised "new issues." In the alternative, Soot sought an opportunity to respond to the issue of publicity. Following communication between and among the parties, the Court directed that Soot file a sur-reply response addressed solely to any "new issues" raised in GE's reply papers, and further directed that GE submit a final reply addressing the issues discussed in Soot's sur-reply. Soot's March 2 motion to strike was rendered moot.

On March 11, Soot filed its sur-reply papers, contending that the issue of whether GE publicized its entry into the high density storage rack market raised issues of fact regarding GE's defense of laches. Soot's papers included an additional affidavit. On March 19, GE submitted its final reply to Soot's sur-reply. GE also submitted four affidavits from ANS employees which dealt with the publication, in various

ANS bulletins, of information regarding the presentation of the GE–ANS Paper at the June 1977 ANS meeting [the "ANS Affidavits"]. The ANS Affidavits further describe how, as the lead author of a paper presented at the ANS annual meeting, Soot would have received copies of the bulletins. On March 23, Soot filed a motion to strike the four ANS Affidavits and any reference to them contained in GE's final reply papers.

There are two strands to the exchange recounted above. First, because Soot has confronted the issue of GE publicity in its sur-reply papers, the Court will consider GE's arguments in this regard. With respect to Soot's March 23 motion to strike the ANS Affidavits and references to them from GE's March 19 final reply submission, the Court has concluded that the affidavits should not be considered.

■ GE argues that, pursuant to Fed.R. Civ.P. 56(e), the Court "may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." GE claims to have first learned of the information testified about in the ANS Affidavits on March 9, and first received the documents attached to them on March 12, several days prior to filing its March 19 final reply. While it is true that GE submitted the ANS Affidavits without authorization from the Court, they do not appear to raise new issues which would prejudice Soot due to an inability meaningfully to challenge the statements contained and practices described therein. On February 26, the same day on which GE's reply papers in response to Soot's opposition to summary judgment were due, Soot filed a supplemental memorandum and affidavits from Soot and Harstead. These affidavits directly confronted GE's argument, advanced initially, that Soot should have been aware of the GE–ANS Paper because reference to it was found in the TVA Proposal for the Watts Bar nuclear facility, and it was presented at the same ANS session as the Soot–ANS Paper. Thus, through the submission of affidavits refuting his and Harstead's knowledge of the GE–ANS Pa-

per, Soot invited further evidence and argument in this area.

Nevertheless, consideration of the ANS Affidavits and related arguments is a matter within the Court's discretion. The Court agrees with Soot that these affidavits contain statements about ANS policies and practices in 1977, which if carried out, "would" have resulted in Soot, Harstead and employees of Stoller having received copies of bulletins and information detailing the scheduled presentation of the Soot-ANS Paper at the same afternoon session at which the GE–ANS Paper was presented. Yet, copies of these documents have not been produced from Soot through the normal discovery process. Essentially for this reason, the Court will not consider the four ANS Affidavits and related arguments contained in GE's March 19 final reply submission. Accordingly, Soot's motion to strike is granted.

## II. THE EQUITABLE DEFENSE OF LACHES

### A. *Standards for the Application of Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that a district court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The court is not to resolve disputed issues of fact, but must "assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11, (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985)).

The mere existence of disputed factual issues, however, is not enough to defeat a motion for summary judgment. *Knight*, 804 F.2d at 11–12; *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam). For the issues of fact to be "genuine," they must have a real

basis in the record before the court, *see Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and most significantly, must be "material to the outcome of the litigation." *Knight*, 804 F.2d at 11. It stands to reason, therefore, that in order to be material, the disputed issues must implicate cognizable legal principles upon which recovery may be had, or liability denied, thus entitling the moving party to judgment "as a matter of law." Fed.R. Civ.P. 56(c); *see Anderson*, 106 S.Ct. at 2510–13; *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 731 (2d Cir.1987); *see also* S.A. Childress, *A New Era For Summary Judgments: Recent Shifts At The Supreme Court*, 116 F.R.D. 183, 189–90 (1987) (discussing *Anderson*).

In the procedural sense, the moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). This burden may be met by demonstrating the lack of any evidence to support the nonmoving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The party opposing summary judgment must then come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Matsushita*, 106 S.Ct. at 1356. When a moving party has carried his burden under Rule 56(c), his "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (footnote omitted). A party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight*, 804 F.2d at 12, nor on a "bare assertion that evidence to support a fanciful allegation lies within the exclusive control of the defendants, and can be obtained only through discovery." *Eastway*, 762 F.2d at 251. In sum, where the court determines that "the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.*

Summary judgment is as appropriate in the context of a patent infringement case as in any other case. *See Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835 (Fed.Cir.1984); *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146–47 (Fed.Cir.1983). As in any other case presented for summary judgment, the "materiality of facts is viewed in light of the legal standard to be applied." *Barmag*, 731 F.2d at 836.

**B. *The Legal Framework***

Congress has declared that, during the seventeen-year term of a patent, the "patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. Congress has created no other limitations period with respect to the commencement of a patent infringement action. The only applicable statute of limitations, found at 35 U.S.C. § 286, provides, in part, that "no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action."

 In the absence of a general limitations period, courts have applied the traditional doctrine of laches when determining issues of timeliness in the patent infringement context. Laches is an equitable defense, the appropriateness of which "must be determined in each case under its particular factual situation." *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, 616 F.2d 1315, 1325 (5th Cir.1980); *see Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d 477, 479 (7th Cir.), *cert. denied*, 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99 (1975). A determination as to the applicability of laches is left to the discretion of the trial court. *Eastman Kodak*, 616 F.2d at 1325.

 The effect of laches is not to bar the suit in its entirety, as is the case with estoppel, but "merely to withhold damages for infringement which occurred prior to the filing of the suit." *Id.; see Advanced Hydraulics, Inc.*, 525 F.2d at 479; *MGA,*

*Inc. v. Centri–Spray Corp.*, 639 F.Supp. 1238, 1241 (E.D.Mich.1986). Again because of the lack of a limitations period generally applicable to patent infringement actions, courts have by analogy applied the six-year period found in 35 U.S.C. § 286 to the doctrine of laches. *See Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 741 (Fed.Cir.1984); *Naxon Telesign Corp. v. Bunker Ramo Corp.*, 517 F.Supp. 804, 807–08 n. 2 (N.D.Ill.1981), *aff'd*, 686 F.2d 1258 (7th Cir.1982).

It is well settled that, in order to assert the defense of laches, a defendant must prove "two essential elements: (1) unreasonable and inexcusable delay in the assertion of the [infringement] claim; and (2) material prejudice to the defendant resulting from the delay." *Leinoff*, 726 F.2d at 741. "[T]he longer the delay, the less need there is to show specific prejudice." *Id.* It is equally well settled that a delay in bringing suit of six or more years creates a presumption both that the delay was unreasonable and that the defendant has suffered prejudice. *See id.* at 741–42; *Eastman Kodak*, 616 F.2d at 1326; *MGA, Inc.*, 639 F.Supp. at 1242; *Coleman v. Corning Glass Works*, 619 F.Supp. 950; *Lemelson v. Carolina Enterprises, Inc.*, 541 F.Supp. 645, 651 (S.D.N.Y.1982); *Naxon Telesign*, 517 F.Supp. at 808.

■ Once in place, the presumption shifts the burden to the patentee to prove the reasonableness of his delay. *See Leinoff*, 726 F.2d at 742. In the alternative, the patentee may show that the defendant engaged in "particularly egregious conduct which would change the equities significantly in plaintiff's favor." *TWM Mfg. Co., Inc. v. Dura Corp.*, 592 F.2d 346, 349 (6th Cir.1979); *see MGA, Inc.*, 639 F.Supp. at 1242. In addition, with the presumption in place, the defendant need produce no additional evidence of prejudice. *Leinoff*, 726 F.2d at 742; *Eastman Kodak*, 616 F.2d at 1326; *TWM Mfg. Co.*, 592 F.2d at 349.

■ The six-year period begins to run "when the patentee has actual or constructive knowledge of the alleged infringing activity." *MGA, Inc.*, 639 F.Supp. at 1242. The Court must look to "the time at which the plaintiff knew or, in the exercise of reasonable diligence, should have known of the defendant's alleged infringing action." *Eastman Kodak*, 616 F.2d at 1326; *see TWM Mfg. Co.*, 592 F.2d at 349 ("notice of infringement" commences six-year period); *Potash Co. of America v. International Minerals & Chemical Corp.*, 213 F.2d 153, 155 (10th Cir.1954). Laches "will not be imputed to one who has been justifiably ignorant of facts which create his right or cause of action." *Id.* (citing cases). However, "ignorance will not of itself excuse delay. The party must be diligent and make such inquiry and investigation as the circumstances reasonably suggest, and the means of knowledge are generally equivalent to actual knowledge." *Id.* (citing cases); *see Marvel Specialty Co. v. Magnet Mills, Inc.*, 297 F.Supp. 1026, 1030 (S.D.N.Y.1969) (patentee is "charged with knowledge of the facts constituting an infringement which he could have known by the exercise of reasonable diligence").

*C. GE's Defense of Laches*

With all of the foregoing in mind, the Court turns to consideration of GE's motion for summary judgment as to the issue of laches. GE argues that there is no genuine issue of material fact as to Soot's actual or constructive knowledge of GE's allegedly infringing storage rack design more than six years prior to his commencing this action. Soot argues that he only learned of GE's alleged infringement in February 1983, when one of his employees conducted a search at the NRC's Public Document Room and discovered documents, such as NSP's submission regarding its Monticello facility, which, upon review, led him to conclude that GE had infringed his patents. Soot denies having any knowledge of the GE–ANS Paper, or generally of GE's efforts in the high density storage rack industry prior to 1983.

*1. The GE–ANS Paper*

■ A central issue on this motion is the significance of the GE–ANS Paper. Soot testified at his deposition that the GE–ANS Paper contained sufficient information for him to conclude there was a

"high probability" that GE had infringed the Soot Patents. *See* Affidavit of C. Joseph Laughon, II, Exh. 17 at 14, 85 Civ. 6492 (JMC) (S.D.N.Y. Jan. 20, 1987) ["Laughon Affidavit"]. This statement takes on added significance in light of the fact that the TVA Proposal, to which Soot, through his consulting company SHA, made a substantial contribution, specifically mentioned the GE–ANS Paper. *See id.*, Exh. 9 at 42–43. GE contends that Soot was either aware of, or should have been aware of the existence of the GE–ANS Paper no later than July 1977.

The thrust of Soot's argument with respect to the GE–ANS Paper is as follows. The TVA Proposal for the Watts Bar nuclear project was actually submitted by the Leslie & Elliot Company, a fuel rack fabricator. The contribution of Soot, SHA and Stoller to the TVA Proposal was related to the structural design and seismic analysis of the proposed storage racks. Furthermore, Soot argues that the portion of the Proposal which mentions the GE–ANS Paper was not prepared or reviewed by him, or by SHA, but, in all likelihood, had been prepared by Stoller and others.

Soot's disavowal regarding the TVA Proposal is unpersuasive for a number of reasons. First, Soot seeks to distance himself from that section of the TVA Proposal which mentions the GE–ANS Paper, stressing that it was not prepared by him. Yet, this section specifically refers to the fact that "[t]he proposed high density [storage rack] design has been developed by [Stoller] and SHA and is based upon the utilization of a modular BORAL storage cell produced by B & P." Laughon Affidavit, Exh. 9 at 42. The Soot Patents relate specifically to the design of high density nuclear fuel storage racks and the utilization of tubular enclosures for the placement of fuel. *See* Laughon Affidavit, Exh. 2 at 8. The "key" B & P BORAL storage cell described in the Proposal is said to be "similar to that which is planned to be employed by other rack suppliers for other storage projects." *Id.* at 43. As an example, the Proposal cites to the GE–ANS Paper and mentions how it describes one such application of similar B & P tubes. *Id.*

According to the TVA Proposal itself, the storage rack design proposed by Leslie & Elliot for the Watts Bar project was developed by SHA, Soot's very own consulting company. *Id.* at 42. A discussion of the proposed rack system mentions the GE–ANS Paper and the utilization of B & P tubes in storage rack projects described therein, as well as the fact that similar applications of B & P tubes were awaiting licensing approval from the NRC. In light of the foregoing, Soot may not summarily dismiss the inclusion of the GE–ANS Paper in the TVA Proposal by stating that he did not personally write that portion of the proposal, or was unaware of its inclusion.

As a patentee, Soot was under an obligation to make a diligent inquiry into any factual circumstances that might reasonably suggest the possibility of infringement. *See Potash Co.*, 213 F.2d at 155; *Marvel*, 297 F.Supp. at 1030; *Van Alen v. Aluminum Co. of America*, 43 F.Supp. 833, 836 (S.D.N.Y.1942). Certainly, a patentee who participates in the submission of a bid on a major project should be charged with knowledge of those facts contained in the bid proposal that relate directly to a design developed by him, and for which he holds two patents.

### 2. *Additional Factors*

Additional factors suggest that, at the least, Soot could have discovered the facts underlying his claims of infringement by the exercise of reasonable diligence and inquiry. Soot and Harstead worked together on the "structural design and seismic analysis" of the proposed storage racks for Watts Bar. Plaintiff's 3(g) Statement of Facts ¶ 11, 85 Civ. 6492 (JMC) (S.D.N.Y. Feb. 20, 1987). Harstead and Soot were partners during all relevant time periods. Although facts within Harstead's knowledge may not be imputed conclusively to Soot, he may be charged with knowledge of at least some information known to Harstead, and which reasonable inquiry of him might have yielded. *See, e.g., Marvel*, 297 F.Supp. at 1030 (knowledge of comptroller of corporation chargeable to corporation generally).

At his deposition, Harstead testified that he knew GE was supplying high density storage racks to the nuclear industry at the same time SHA was submitting proposals to the TVA and to various other nuclear facilities. *See* Supplemental Affidavit of C. Joseph Laughon, II, Exh. 7 at 20–21, 85 Civ. 6492 (JMC) (S.D.N.Y. Feb. 26, 1987) ["Laughon Supp. Affidavit"]. Harstead even uses the word "we" when describing his extent of knowledge about GE's involvement with high density storage rack systems. Although Soot contends that he was not aware of any possible infringement until 1983, he also testified that he had been fully aware that GE was a "rival" in the industry and "[c]ertainly ... was bidding [on high density storage rack projects]." Laughon Supp. Affidavit, Exh. 7 at 3.

Soot also contends that there was no reason for him to be aware of GE's efforts to establish a market for its high density storage racks. However, during discovery Soot produced an issue of "Tennessee Valley News," dated October 24, 1977. *See* Laughon Affidavit, Exh. 16 ["TVA News"]. This issue of TVA News reported that a contract for the installation of high density storage racks at the Watts Bar facility was about to be awarded. *See id.* at 2. Soot certainly had a significant interest in this contract, as SHA had contributed to the bid submitted by Leslie & Elliot for fabrication of the storage rack. Several lines above the reference to the Watts Bar contract, there is a passage concerning the TVA's expansion of its fuel storage capacity at various facilities and the awarding of a $20 million contract to GE for the tripling of spent fuel rod capacity at TVA's Brown's Ferry Station facility. *See id.*

### 3. *Publicity*

In further support of its motion, GE has presented evidence that it sought to publicize its entry into the high density storage rack market in 1977 and 1978. Along these lines, GE submitted the affidavit of J.S. Barber, who at the relevant times was GE's Manager of Promotion and Publication Services. *See* Affidavit of J.S. Barber, 85 Civ. 6492 (JMC) (S.D.N.Y. Mar. 2, 1987) ["Barber Affidavit"]. Attached to the Barber Affidavit are two exhibits. The first is an advertisement for GE's high density fuel storage racks, which describes the racks in general terms and depicts their checkerboard design. The advertisement appeared in the November 1977 issues of "Power Engineering" and "Nuclear News", the December 1977 issue of "Nuclear News", the February 1978 issue of "Power Engineering", the April 1978 issue of "SVA Bulletin" and the May 1978 issue of "Energy International." *Id.* ¶ 2. By May 1978, over 100,000 copies of the advertisement had appeared in these various publications. Moreover, Barber states that copies of the advertisement were sent to GE nuclear sales representatives for distribution to customers, as part of an "intended [effort] to make widely known in the nuclear industry [GE's] offering for sale its nuclear fuel storage system." *Id.* ¶ 3.

Soot counters this argument as follows. In connection with NSP's submission to the NRC regarding replacement of spent fuel storage racks at the Monticello facility, GE was asked to provide additional information about its high density storage rack design. Lyle L. Zahn, Manager of Spent Fuel Services, submitted to the NRC an affidavit explaining why the additional information sought was proprietary in nature and should not be disclosed. The NRC eventually granted GE's request. Subsequent to the limited release of a GE brochure entitled "High Density Fuel Storage Systems" in November 1977, Zahn revised his affidavit to take into account the additional information contained in the brochure.

In the Court's view, Soot's reliance on the Zahn affidavit, and GE's decision to seek protection for what it deemed proprietary information, is misplaced. First, the argument is undermined by Soot's deposition testimony that the public information on file at the NRC with respect to the Monticello facility, along with other public documents available in 1977 and 1978, were sufficient for him to conclude that GE had probably infringed the Soot Patents. Soot came to his conclusion based on these documents, not on more detailed information withheld from the public by GE. Thus,

GE's efforts to limit the amount of detailed information with respect to its high density storage rack design is not substantially related to the issue of whether there was available to Soot in 1977 and 1978 sufficient facts for him reasonably to have known of GE's alleged infringement.

Soot suggests that, in any event, the question of GE's publicity efforts raises additional issues of fact. The Court disagrees. There is no "genuine" dispute that, relative to the size and character of the nuclear power industry, by 1978, GE had embarked on a campaign to publicize its high density storage rack systems, albeit one of a limited and somewhat veiled nature with respect to details. Soot is correct in arguing that GE produced no evidence showing that he actually received the publications containing the advertisements. Nevertheless, this argument is unavailing. Evidence regarding publicity does not support an argument based on Soot's actual knowledge of GE's design, which Soot denies. Rather, this evidence supports the argument that, under the circumstances and given what Soot did know about "rival" GE, a diligent inquiry on his part would have revealed that, in fact, GE was advertising, constructing and installing high density storage rack systems utilizing B & P tubes. Such knowledge would have led Soot to inquire further and to discover the basis for his claims of infringement. There is no dispute that, by mid–1978, there was sufficient public information available to Soot, at the NRC alone, for Soot to conclude that GE had infringed his patents.

As a patentee, Soot had a responsibility to investigate the possible infringement of his patents and is charged with knowledge of facts constituting infringement which could have been discovered in the exercise of reasonable diligence. *See Marvel,* 297 F.Supp. at 1030. Certainly, Soot had the "means of knowledge" whereby, with reasonable diligence, he could have discovered the factual basis for his claims. *See Van Alen,* 43 F.Supp. at 836. Soot's denial of any knowledge of GE's activities with respect to high density storage racks is simply unpersuasive in light of his position in the industry, his active participation in bids for high density storage rack systems, and his self-professed knowledge that GE was a "rival" in the market which was also submitting bids on high density storage racks.

In light of the foregoing, the Court concludes that Soot must be charged with knowledge of facts sufficient to inform him of any possible infringement by GE no later than mid–1978, more than six years before commencing this action. By that time, Soot had sufficient knowledge about GE, and there was sufficient public information available, to prompt Soot to investigate further as to the facts constituting GE's alleged infringement of his patents.

### D. *Shifting Burdens*

■■■ Because more than six years elapsed from the time Soot is charged with constructive knowledge of the facts of infringement, the burden shifts to him both to demonstrate the reasonableness of his delay in bringing suit and to rebut the presumption of material prejudice to GE. *See Leinoff,* 726 F.2d at 742; *Eastman Kodak,* 616 F.2d at 1326.

Rather than attempting to rebut these presumptions, however, Soot contends that GE engaged in egregious conduct which prevents it from asserting the equitable defense of laches. *See, e.g., TWM Mfg. Co.,* 592 F.2d at 349. This argument is premised upon (1) GE's allegedly willful infringement of the Soot Patents, and (2) GE's bad faith correspondence with counsel for Soot between 1983 and 1984. Each of these contentions will be addressed in turn.

#### 1. *Willful Infringement*

The essential evidence advanced by Soot in support of his willful infringement argument is a report of a meeting of GE personnel held on October 10, 1978. *See* Affidavit of Francis J. Murphy, Exh. R, 85 Civ. 6492 (JMC) (S.D.N.Y. Feb. 20, 1987) ["Murphy Affidavit" and "October Report"]. The meeting was attended by senior engineers involved in the design and construction of GE's high density storage racks, as well as patent counsel S.E. Turner [the "partici-

pants"]. Turner authored the October Report. GE had learned of the Soot Patents earlier that year and the October meeting was convened to discuss the patents and the issue of potential claims of infringement.

The October Report notes that the participants considered whether GE's design might be deemed to infringe any of the claims of the Soot Patents. The Report also notes the conclusions reached at the meeting. First, the participants concluded that any claims of infringement based on Soot's 227 Patent were probably invalid, in light of U.S. Patent 3,166,481, issued to GE in 1965 [the "Braun Patent"]. The Braun Patent, which had not been cited by Soot in his patent prosecution, showed "a checkerboard pattern of tubular fuel-receiving channels in a reactor core." *Id.* at 2.

Second, the participants concluded that claims based on Soot's 897 Patent were also invalid, in light of U.S. Patent 4,006,-362 [the "Mollon Patent"]. The Mollon Patent, also not cited in Soot's prosecution, showed use of "a spent fuel storage tube formed of inner and outer walls between which is sandwiched poison material." The participants decided to take "no action" with respect to the Soot Patents because they were "well-convinced that [the] claims [were] invalid" in light of the Braun and Mollon patents.

Far from the smoking gun Soot seeks to portray, the October Report merely records what appears to have been the studied conclusions of GE's patent counsel and senior engineers responsible for high density storage rack design and construction. Certainly, GE's decision to take "no action" with respect to the Soot Patents, and to proceed with its own development of high density storage racks was "commercial" in nature, but, far from constituting a deliberate decision to infringe, the decision simply seems based on the conclusion that GE's design did not infringe any valid claim of the Soot Patents. The issue of whether GE actually infringed the Soot Patents is an entirely separate one. Nothing in the October Report, however, suggests that it was the conclusion of any of the participants at the meeting that GE would be infringing if it proceeded with its own design. The deposition testimony of patent counsel Turner supports the notion that the participants had concluded that the Soot Patents were not being infringed and indeed, that the claims of the Soot Patents were probably invalid in light of the Braun and Mollon Patents. *See* Murphy Affidavit, Exh. P at 71–83.

### 2. *Legal Correspondence*

Soot also argues that GE caused him to delay bringing suit by engaging in bad faith correspondence with his attorney over the possibility of a license for the Soot Patents. In order to better address this argument, a brief review of the correspondence is necessary.

On June 30, 1983, Soot's attorney, Francis J. Murphy, Esq., wrote to the "President" of GE. In his letter, Murphy offered GE a nonexclusive license under either or both Soot Patents, at a royalty rate of 7½ percent of the selling price of the storage racks. The letter concluded as follows: "If you wish to discuss such a license, please contact me." Murphy Affidavit, Exh. E. On July 11, GE's General Patent Counsel, H.F. Manbeck, Esq., wrote to Murphy, stating that his June 30 letter was being forwarded to GE's Nuclear Energy Business Operations division ["NEBO"], which would respond directly if interested in further discussions. On August 25, Murphy wrote to Manbeck, stating that the reason for the June 30 letter was to suggest to GE that at least some of GE's storage rack installations infringed claims of the Soot Patents. Murphy requested that GE respond to the license offer by September 15.

On September 9, Ivor J. James, Jr., Patent Counsel for NEBO, wrote to Murphy. James described the Braun Patent and stated that, in light of it, Soot's 227 Patent "would be held invalid if put to the test." *Id.*, Exh. K at 2. Also on September 9, Murphy informed Manbeck that GE's installation at Carolina Power & Light Company's Brunswick facility infringed Soot's patents. In response, Murphy was told that GE would review Soot's claims and respond within thirty days. *Id.*, Exh. L.

The letter again stressed that GE had "serious questions regarding the validity of at least one of [Soot's] patents and [is] continuing to evaluate their validity and the prior art." *Id.*

No communication between GE and Murphy took place for several months. Then, on July 11, 1984, Murphy wrote to Turner, who had written some of GE's letters on behalf of James. The July 11 letter complained of GE's failure to respond to the claims made concerning the Brunswick facility and called GE's attention to the Brown's Ferry, Hatch and Monticello facilities. The letter also contained a one-paragraph critique of the Braun Patent, and concluded that it "in no way effects the validity of [Soot's 227 Patent]." *Id.*, Exh. M. On July 20, GE responded, in detail, with the reasons for its conclusion that Soot's 227 Patent was invalid in light of the earlier Braun Patent. GE continued to assert that licensing discussions were premature and that, following "a detailed comparison of the Soot patent claims and the detailed design drawings of [GE's] spent fuel storage racks," it had concluded that "no valid claims in the Soot patents . . . can be read on [GE's] racks." *Id.*, Exh. N at 3. Accordingly, GE denied Murphy's earlier request to supply him with detailed design drawings for the GE storage racks at the facilities mentioned above.

The correspondence just described does not justify a tolling of the laches period in this case, if indeed that is what is sought by Soot. Although there was an apparently inexplicable "hiatus" from October 1983 to July 1984, where GE did not respond as promised, GE had early on placed Soot on notice that it had serious doubts as to the validity of any claims of infringement of the Soot Patents. Indeed, in the September 9, 1983 letter, Turner analyzes Soot's 227 Patent in light of the Braun patent and asserts that the Soot Patent would be "held invalid if put to the test." *Id.*, Exh. K at 2. Far from deceiving Soot as to the possibility of a license, GE is denying the validity of the 227 Patent itself.

In any event, GE's July 20, 1984 letter can leave no other conclusion in the mind of the reader, except that GE had serious doubts as to the validity of the claims of the Soot Patents and was in no way inclined to enter into licensing discussions. Even with such a clear statement of GE's position, Soot waited an additional eleven months before commencing this action, despite having told GE as early as August 25, 1983, that he believed at least some GE storage rack installations infringed his patents. *See id.*, Exh. G. In light of the foregoing, the Court concludes that Soot has failed to demonstrate GE's bad faith in the course of the June 1983 to July 1984 correspondence.

### E. *Summary*

In sum, GE has proven that no genuine issue of material fact exists as to the question of laches. Because Soot reasonably should have been aware of GE's alleged infringement no later than mid–1978, which is more than six years prior to his commencement of this action, the unreasonableness of his delay and material prejudice to GE are presumed. Soot has failed to overcome either presumption, and has further failed to show conduct on the part of GE, egregious or otherwise, which might tip the balance of equities in his favor and deny GE the defense of laches. For all of the reasons stated above, GE's motion for summary judgment with respect to the issue of laches is granted.

### CONCLUSION

Defendant's motion for summary judgment with respect to the issue of laches, barring plaintiff from seeking or recovering damages for alleged infringement prior to the commencement of this action, is granted. Fed.R.Civ.P. 56.

SO ORDERED.