**ABB ROBOTICS, INC., and Cincinnati Milacron, Inc., Plaintiffs,**

v.

**GMFanuc ROBOTICS CORPORATION, Defendant.**

No. 92–C–58.

United States District Court, E.D. Wisconsin.

Aug. 10, 1993.

Donald H. Carlson, Riordan, Crivello, Carlson, Mentkowski & Steeves, S.C., Milwaukee, WI (Walter D. Ames, Watson, Cole, Grindle & Watson, Washington, DC, of counsel), for plaintiffs.

Ernie L. Brooks, Brooks & Kushman, Southfield, MI, Howard A. Pollack, Godfrey & Kahn, S.C., Milwaukee, WI, for defendant.

## DECISION AND ORDER

RANDA, District Judge.

Before the Court is Defendant GMFanuc Robotics Corporation's ("Fanuc") Motion for Summary Judgment on the grounds of Laches and Estoppel in this patent infringement action filed by Plaintiffs ABB Robotics, Inc. ("ABB") and Cincinnati Milacron, Inc. ("CM"). For the reasons set forth more fully below, Fanuc's Motion as to both Laches and Estoppel will be granted.

## PRELIMINARY BACKGROUND

### The Parties

ABB is the American subsidiary of ABB Sweden, which is in turn a subsidiary of ABB ASEA, a multinational corporation based in Switzerland. Robotics is one of many industries in which ABB ASEA is involved. CM is an Ohio Company that was an active participant in the robotics industry throughout the 1980s. Fanuc, a Michigan based manufacturer of robotic devices, was created in the early 1980s as a joint venture between GM and Fanuc LTD, (a Japanese company) as a result of the growing automation of the car industry. The patent at issue is No. 4,068,-536 ('536) (also referred to as the "Stackhouse patent") which concerns a robotic wrist.

### Chronology of Events

In early 1984, CM contacted Fanuc regarding certain robot control patents which CM believed Fanuc would be required to take a license under. Correspondence and discussions began between Counsel for CM, Richard Eby and Counsel for Fanuc, David Syrowik. In letters dated July 9, 1984, and January 21, 1985, Syrowik indicated that Fanuc did not require a license under any of the control patents. (the '536 patent had apparently not yet been discussed) (Exhs. 6 & 7, attached to Fanuc's Motion) In August of 1985, CM, through Richard Eby, raised the issue again with respect to two particular control patents. Negotiations followed which resulted in Fanuc taking a license under some of CM's patents.

In early 1984, at approximately the same time that CM and Fanuc were discussing the CM control patents, Fanuc was developing a new paint-spray robot, designated the P–150. In January of 1985, Fanuc filed an application for a patent on its hollow robot wrist design (utilized in the P–150). That patent, No. 4,708,580 ('580), ultimately issued on November 24, 1987)[1] Fanuc displayed the P–

1. At footnote 1 of its Motion, Fanuc indicates

that during the prosecution of the '580 patent, it

**1388**

150 commercially at a major robotics industry exhibition in June of 1985. Part of the display included informational brochures detailing the workings of the improved robotic wrist. (a copy of which is attached as Exhibit 53 to Fanuc's Reply)

Eby and Syrowik met on September 18, 1985 and discussed an agreement whereby Fanuc would take a license under CM's control patents. In addition, they discussed the possibility that the P–150 infringed the '536. At the meeting Eby indicated that CM was serious about the enforcement of its patent rights under the '536. Syrowik maintained that the P–150 did not infringe the '536. (Syrowik Aff. ¶¶ 3–5, Exh. 15 of Fanuc's Motion) That the '536 was discussed by Eby and Syrowik is supported by a letter from Eby to Syrowik on September 25, 1985. (Exh. 16, Fanuc's Motion) That letter states, "This letter is to follow up our meeting of September 18, 1985 ... We also requested that you study the P–150 painting robot relative to Milacron's Patent No. 4,068,536, and you indicated you would respond by the end of November, 1985". On January 21, 1986 Syrowik wrote Eby, "I would like to apologize for the delay in getting back to you on our evaluations of the Cincinnati three roll wrist patent (i.e., the '536) In summary, it is GMF's position that we have no need for a license under the Stackhouse patent."

It was not until July 24, 1986 that CM contacted Fanuc and requested a meeting to discuss "robot wrist designs from the perspective of Milacron's patent." (The parties do not dispute that this is a reference to the P–150 and the '536 patent.) (Exh. 19, Fanuc's Motion) In response, Fanuc sent CM a letter again disputing infringement and enclosing two pages which depicted and described the wrist assembly of the P–150. (Exh. 20, Fanuc's Motion; Exh. N., ABB/CM's Cross Motion) On September 3, 1986, CM and Fanuc met to discuss the issue further and Fanuc reiterated its position that the P–150 did not infringe. (Exh. 15, Syrowik Aff., ¶ 7) CM management held a meeting and decided not to sue Fanuc. (Exh. 2, Rehfeldt Dep., p. 13; Exh. 14, Cole Dep., p. 12) No further discussion took place.

disclosed CM's '536 patent, but the '580 issued

In 1988, CM granted a license under certain CM robotics patents to ABB Sweden. In 1990, ABB entered into an asset purchase agreement with CM wherein ABB obtained CM's Industrial Robot Division and an exclusive license from CM under the '536 patent. ABB SWEDEN, through its various subsidiaries is a major competitor of Fanuc. Around this same time, Fanuc, as part of its own patent enforcement efforts, contacted a number of companies, including subsidiaries of ABB Asea, informing them of Fanuc patents, including the '580 (incorporated in the P–150). Thereafter, correspondence between ABB Asea and Fanuc began, beginning in June of 1991, wherein ABB Asea charged Fanuc with infringement of the '536 patent. (Exh. 46, Fanuc's Motion) Fanuc denied infringement and responded to ABB Asea that any enforcement action would be barred by laches and estoppel. (Exh. 48, Fanuc's Motion) On January 17, 1992, ABB and CM filed this suit against Fanuc. Further facts will be discussed in the legal analysis.

## LEGAL ANALYSIS

### Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue as to any *material* fact and that the moving party is entitled to judgment as a matter of law." (emphasis added) Fed. R.Civ.P. 56(c). A fact is genuinely disputed only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Judge Posner, in *Palucki v. Sears, Roebuck & Company*, 879 F.2d 1568 (7th Cir.1989), stated:

A district judge faced with such a motion must decide, subject of course to plenary appellate review, whether the state of the evidence is such that, *if the case were tried tomorrow, the plaintiff would have a fair*

anyway.

*chance of obtaining a verdict.* (emphasis added)

*Id.* at 1573–74.

■ Summary Judgment is equally appropriate in the context of a patent infringement case. *Soot v. General Electric Company,* 681 F.Supp. 157, 162 (S.D.N.Y.1987), citing *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831 (Fed.Cir. 1984); *A.C. Aukerman Co. v. R.L. Chaides Construction Co.,* 960 F.2d 1020, 1039 (Fed. Cir.1992) ("If the decision on laches is made on summary judgment, there must, in addition, be no genuine issues of material fact, the burden of proof of an issue must be correctly allocated, and all pertinent factors must be considered.") (citations omitted). The defenses of laches and estoppel are established by a "preponderance of the evidence". *Id.* at 1045–46.

■ To prove laches, Fanuc must show that (1) the delay in filing suit was unreasonable; and (2) that to permit ABB/CM to proceed with the suit would materially prejudice Fanuc. With respect to laches, if the delay is longer than 6 years, a presumption arises that both (1) and (2) have been proven.[2] The presumption causes the burden of *production,* (not the burden of proof) to be shifted to ABB/CM and they must come forward with evidence "sufficient to support a finding of the nonexistence of a fact" as to either element (1) or (2).[3] In a laches analysis, the clock starts ticking when the paten-

tee—CM and then ABB—"knew or should reasonably have known of the infringement".[4]

## I.

## LACHES

### A. Presumption of Laches

■ The question of when a patentee "knew or should have known" is one of fact. *Aukerman* at 1038 ("If the patentee is successful on this factual issue, no presumption arises." (citation omitted)) In the instant case, ABB/CM "vigorously contest as issues of fact" when the laches period began. (ABB/CM's Cross Motion at 2) ABB/CM argue that it was not until August 12, 1986 when CM received detailed drawings from Fanuc that it knew the "structure of the P–150 robot". (ABB/CM's Cross Motion at 7) ABB/CM argues that the laches period does not begin until that point because "one cannot tell a book by its cover or, in this case, the internal structure of an industrial robot from its shroud." (ABB/CM's Cross Motion at 9) Therefore, the period of delay is less than six years (this action was filed on January 12, 1992), the presumption of laches does not arise, and Fanuc must go forward with proof of unreasonable delay and material prejudice. Fanuc argues that CM knew perhaps as early as November of 1984 that Fanuc was developing the P–150. Support for this argument is a CM memorandum which notes, "GMF has developed and ready to announce their own 3 roll wrist."[5] (Fan-

---

**2.** If the patentee delays longer than six years, the defense of laches is presumed. The six year presumption is borrowed from 35 U.S.C. § 286 which provides a six year damage limitation period. Instead of counting backwards from the date of suit, "[t]he six years for laches begins with a patentee's knowledge of infringement and counts forward." Therefore, laches is presumed (i.e. that the delay was unreasonable and that the defendant has been materially prejudiced) if the patentee delays longer than six years from the date he had "actual or constructive knowledge of the defendant's acts of alleged infringement". *Aukerman* at 1037.

35 U.S.C. § 286 **Time Limitation on Damages** in pertinent part: Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to filing of the complaint or counterclaim for infringement in the action.

**3.** The burden of persuasion does not shift. *Aukerman* at 1039. "If patentee presents a sufficiency of evidence which, if believed, would preclude a directed finding in favor of the infringer, the presumption evaporates and the accused infringer is left to his proof.... at all times, the defendant bears the ultimate burden of persuasion of the affirmative defense of laches." *Id.* at 1038.

**4.** ABB, as CM's licensee, is bound by any delay or failure of CM to assert its rights under the '536 patent. *Continental Coatings Corp. v. Metco, Inc.,* 464 F.2d 1375, 1377 (7th Cir.1972)

**5.** ABB/CM argue that use of this memorandum is "a last desperate effort" because the individual who made the notation, Frank Brennan, had received the quoted information from a customer and did not know the identity of the "putative GMFanuc wrist" and Mr. Brennan, "did not and does not know the structure of the wrist or the

uc's Motion at 13; Exh. 13) This would mean that ABB/CM delayed more than seven years in bringing suit.

Fanuc also argues that the laches period began at some point in the summer of 1985. In January of 1985, Fanuc filed its patent application for the hollow wrist utilized in the P–150 and P–155 robots. In June of 1985, it displayed the P–150 at a major robotics industry exhibition. Accompanying the demonstration was a brochure with drawings which describe the attributes of the P–150. (Exh. 53, attached to Fanuc's Reply) Whether these publications are detailed enough so that CM knew or should reasonably have known that the P–150 infringed its '536 patent is not clear. Nonetheless, CM had enough information to raise the issue of infringement at a September 18, 1985 meeting.[6] According to Syrowik (counsel for Fanuc) the following was said at the September 18, 1985 meeting, "CM explicitly informed Fanuc Robotics that CM was serious about enforcement of its rights under the '536 patent against Fanuc Robotics." CM also informed Fanuc that, "CM would not license Fanuc Robotics under the '536 patent." In addition, Syrowik informed CM that Fanuc was aware of the '536 patent and believed that the robot wrist of the P–150 "did not infringe the '536 patent". (Syrowik Aff. at ¶¶ 4, 5, Exh. 15) Subsequently, C. Richard Eby, counsel for CM wrote to Syrowik, "[t]his letter is to follow up our meeting of September 18, 1985 ... We also requested that you study the P–150 painting robot relative to Milacron's Patent No. 4,068,536, and you indicated you would respond by the end

of November, 1985". In response, Fanuc again denied infringement in a January 21, 1986 letter. (Fanuc's Motion, Exh. 17) CM did not contact Fanuc about the matter until July 24, 1986. (Fanuc's Motion, Exh. 20) In response, Fanuc sent a letter to CM with drawings to illustrate its position that the P–150 did not infringe the '536 patent. (ABB/CM's Cross Motion, Exh. N) A meeting was held on or about September 3, 1986 to discuss the matter. At that meeting, Fanuc again denied infringement (Syrowik Aff., ¶¶ 6, 7) Following the meeting, CM made a consensus decision not to sue Fanuc for infringement. (Fanuc's Motion at x; Exh. 2, Rehfeldt Dep., p. 13; Exh. 14, Cole Dep., p. 12) Following the September 1986 meeting, no further discussions took place between CM and Fanuc regarding the '536 patent.

If the September 18, 1985 meeting is the first time CM raised the issue of infringement of the '536 patent with Fanuc, something must have given it cause to do so. It could have been either the fact of Fanuc's application for the '580 patent (utilized in the P–150) or the robotics show in June of 1985 where the P–150 was demonstrated. In either case, CM's in-house patent counsel, C. Richard Eby cannot recall when CM first became aware of Fanuc's allegedly infringing activities or the existence of documents which might resolve that question. (Fanuc's Motion at xv).[7] ABB/CM argue that until it received the August 12, 1986 letter, "nothing indicate[s] that Mr. Eby or anyone else at Milacron had any knowledge of the internal

truth of the information." (ABB/CM's Cross Motion at 10; Declaration of Frank Brennan, Exh. U) Nevertheless, the significance of a *three roll* wrist becomes evident from ABB/CM's own Brief. In discussing its other enforcement activities, ABB/CM states, "[a]nother organization that seemed to market an infringing wrist was Unimation. Its wrist turned out to be a *two-roll* wrist and not infringing." (ABB/CM's Motion at 9, Exh. S, 39) This suggests that CM's discovery of a Fanuc Robotics' *three roll* wrist was significant and might have required further investigation.

6. This meeting was convened, at least in part, to resolve licensing agreements with respect to certain other CM control patents. Fanuc did in fact take licenses under these patents.

7. Fanuc's Motion, Exhibit 9, Eby Deposition, p. 9:

Q. Do you recall the P–150 painting robot?
A. I remember seeing the P–150 painting robot, yes.
Q. Do you know how long before September 18th, 1985 you first were aware of the P–150 painting robot?
A. No, I can't specify that.
Q. Do you know whether there would be any record of when you learned of it before September 18th, '85?
A. No, I can't identify any.
Q. Do you know whether there would be such records at Cincinnati Milacron?
A. No.

structure of the P–150 robot ...". (ABB/CM's Cross Motion at 8). In addition: "Even presuming that the P–150 GMFanuc robot was exhibited at a trade show in June of 1985, and that the exterior of the robot could be seen by representatives of Milacron, that does not mean that the interior structure beneath the shroud of the P–150 was exposed to permit plaintiffs to make a determination whether the P–150 infringed the Stackhouse patent-in-suit. For example, Mr. Eby testified that he had become aware of several potential infringers of the Stackhouse patent, or at least those who Milacron thought might be infringing. One company was Yaskawa, whose robot arm was seen by Milacron. [Exh. S; Eby Dep. Tr. 38, 39] Mr. Eby advised Yaskawa of the existence of the Stackhouse patent; Yaskawa sent them a drawing of the wrist they were using and Milacron concluded there was no infringement."

(ABB/CM's Cross Motion at 9)

Interestingly, ABB/CM do not clearly indicate whether they requested the drawing which was sent by Yaskawa. ABB/CM has not disputed that CM never requested drawings and the "only reasonable inference" is that "Fanuc's display of the accused device at the robot exhibition in June of 1985 provided CM with all the information it needed to determine that Fanuc was infringing the patent-in-suit." (Fanuc's Reply at 2–3)

The Court concludes that CM "knew or should have known" of the "infringing activity" some time during the summer of 1985, or at the latest, at the September 18, 1985 meeting.

The six year period begins to run 'when the patentee has actual or constructive knowledge of the alleged infringing activity.' *MGA, Inc.* [*v. Centri–Spray Corp.*], 639 F.Supp. [1238] at 1242 [ (E.D.Mich. 1986) ]. The Court must look to 'the time at which the plaintiff knew or in the exercise of reasonable diligence, should have known of the defendant's alleged infringing action.' [*Studiengesellschaft Kohle mbH*

*v.*] *Eastman Kodak* [*Co.*], 616 F.2d [1315] at 1326 [ (5th Cir.1980) ]; *see TWM Mfg. Co.* [*Inc. v. Dura Corp.*], 592 F.2d [346] at 349 [ (6th Cir.1979) ] ('notice of infringement' commences six year period); *Potash Co. of America v. International Minerals & Chemical,* 213 F.2d 153, 155 (10th Cir. 1954). Laches 'will not be imputed to one who has been justifiably ignorant of facts which create his right or cause of action.' *Id.* (citing cases). However, 'ignorance will not itself excuse delay. The party must be diligent and make such inquiry and investigation as the circumstances reasonably suggest, and the means of knowledge are generally equivalent to actual knowledge.' *Id.* (citing cases); *see Marvel Specialty Co. v. Magnet Mills, Inc.,* 297 F.Supp. 1026, 1030 (S.D.N.Y.1969) (patentee is "charged with knowledge of the facts constituting an infringement which he could have known by the exercise of reasonable diligence.")[8]

*Soot,* 681 F.Supp. at 163.

ABB/CM take the position that until CM knew unequivocally that the P–150 infringed, the laches period did not begin. The case law does not support that conclusion. Consider the following from *Coleman v. Corning Glass Works,* 619 F.Supp. 950, 953 (W.D.N.Y. 1985), "Even if Dr. Coleman (patentee) did not know whether the Corvac was technically an 'infringement' in July, 1975, he knew all the facts concerning the Corvac project, and that he had somehow been wronged."; *See also, Naxon Telesign Corp. v. Bunker Ramo Corp.,* 517 F.Supp. 804, 808, n. 3 (N.D.Ill. 1981) citing *Pearson v. Central Ill. Light Co.,* 210 F.2d 352, 356–57 (7th Cir.1954) ("Even if Naxon had been 'unsure' of the infringement, it had a duty promptly to investigate and determine if infringement existed.")

Even assuming a standard of "clear evidence of infringement", the fact that CM did not request detailed drawings supports a strong inference that it had "clear" evidence prior to the September 1985 meeting. ABB/CM have not disputed that CM made its charge of infringement at the September

---

8. *MGA, Inc. v. Centri–Spray Corp.,* 639 F.Supp. 1238 (E.D.Mich.1986); *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.,* 616 F.2d 1315 (5th Cir.) *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980); *TWM Mfg. Co. v. Dura Corp.,* 592 F.2d 346 (6th Cir.1979).

18, 1985 meeting and ABB/CM have not offered evidence to rebut Fanuc's argument that CM never requested drawings of the internal structure of the P–150. In addition, ABB/CM have offered no evidence suggesting that Fanuc refused to send detailed drawings.[9]

The Court cannot conclude that the period of laches did not commence until CM received the August 1986 letter. ABB/CM knew or should have known of the infringing activity some time during the summer of 1985. To hold otherwise would allow a patentee to delay suit indefinitely and then assert it was not "certain" of infringement because the defendant/infringer failed to provide it with the necessary information. (in this case, unsolicited drawings) In addition, the patent holder's responsibility to police its patent rights would be shifted to the putative defendant/infringer. ABB/CM knew or should have known of the alleged infringement, at the latest, by the September 18, 1985 meeting. Therefore, the presumption of laches arises and the burden of going forward with "evidence sufficient to support a finding of the nonexistence of a presumed fact" is shifted to ABB/CM. *Aukerman* at 1037. ABB/CM meet their burden by introducing "evidence sufficient to raise a genuine dispute as to *either* delay or prejudice." (emphasis added) *Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290, 1293 (Fed.Cir.1992).

### B. Reasonableness of the Delay

■ There can be no argument that ABB/CM delayed in bringing suit; the issue is whether that delay was reasonable or excusable. Because ABB/CM must shoulder the burden of production, they must put forward "evidence sufficient to support a finding of the nonexistence of the presumed fact". *Aukerman* at 1037. ABB/CM have not presented evidence with respect to almost all of the justifications for delay recognized by *Aukerman*. Those justifications include: (1) The patentee was involved in other litigation; (2) The patentee was engaged in negotiations with the accused infringer; (3) The patentee was in a state of poverty or illness; (4) Wartime conditions; (5) The infringement was de minimis at first; and (6) There was a dispute over patent ownership. *Id.* at 1033. Of the justifications outlined above, only one has any relevance to this case—negotiations between the patent holder and the alleged infringer.

ABB/CM did not address the "negotiations" excuse in their motion papers. Instead, in response to Fanuc's Findings of Fact, ABB/CM assert, "CM did engage in negotiations with GMFanuc with a view toward settlement or licensing. One such instance was the "wrist meeting" on September 3, 1986.... The infringement of GMFanuc could have been settled at that time." (ABB/CM's Local Rule 6.05(b)(1) Responses to Fanuc's Proposed Findings of fact, ¶ 7) This appears to contradict the testimony of CM's own patent counsel Richard Eby. (Exh. 9, Eby dep., pp. 17, 29)[10] As Fanuc highlights, the parties were "*never* involved in *any* negotiations regarding the '536 patent. In fact, CM admits that it had an *exclusionary* practice regarding licensing under the '536 patent." (emphasis in original) (Fanuc's Motion at 14–15). Fanuc argues that, "[i]n light of (the exclusionary licensing practice), and Fanuc's conviction that it did not infringe the '536 patent ... [t]he only "settlement" available to Fanuc Robotics would have been total capitulation in the form of either a withdrawal of the P–150 paint-spray robot from the market, or complete redesign of the P–150 robot wrist." *Id.*

---

**9.** It is unclear from the record whether the drawings which were sent to CM in August of 1986 were requested by CM. The letter reads simply, "As promised ..." (ABB/CM's Cross Motion, Exh. N).

**10.** Q. Would you have licensed GMF under the Stackhouse patent?
A. That wasn't my decision. We had a history of an exclusionary policy with regard to that patent.

Q. In simple terms, that meant you weren't licensing the Stackhouse 536 patent?
A. That's correct.
Q. Did you ever negotiate with David Syrowik ... in any sense regarding licensing of Stackhouse 536 patent, to your knowledge, to your recollection?
A. Not that I remember.

The sole argument put forth by ABB/CM is that "any delay was excusable because one does not sue one's best customer without clear proof." (ABB/CM's Cross Motion at 11) In support thereof, ABB/CM offers the deposition testimony of Mr. Chris Cole and George T. Rehfeldt, former group vice-president of CM.

> * * * they (GM—Fanuc Robotics' parent company) were also a very significant major customer to Cincinnati Milacron, and there was some reticence on our part to be too aggressive in enforcing something we didn't feel for sure we could prove at that time or could prove without a lot of money and effort spent against the customer.

Cole Dep. at p. 10, Exh. 14

> I'm sure one of the issues, obviously, would have been General Motors as a major customer ...

Rehfeldt Dep. at p. 6, Exh. 2

This justification is not found in *Aukerman* and has been explicitly rejected. *MCV, Inc. v. King–Seeley Thermos Co.*, 870 F.2d 1568, 1572 (Fed.Cir.1989) ("To the extent MCV would justify its delay because an earlier assertion might have jeopardized business dealings with Halsey Taylor, the excuse is insufficient."); *See also, General Electric Co. v. Sciaky Bros., Inc.*, 304 F.2d 724, 727 (6th Cir.1962) ("The delay ... was unreasonable, inexcusable, and unexplained. Whether General Electric might have been influenced by the fact that Sciaky was making substantial purchases of electrical supplies from it is not material."); 4 Chissum, Patents, § 19.-

05[2][b][vi] [11] ("The patent owner's desire to maintain good relations with the infringer as a customer, supplier or employer is generally held not to constitute a sufficient excuse for delay in filing suit").

Finally, ABB/CM have argued that the reasonableness of the delay is "not adapted to summary determination". (ABB/CM's Reply at 10) While this argument is facially attractive, ABB/CM's failure to marshall *any* facts as to *any* of the recognized justifications supports summary judgment on this issue because the only reason for the delay is an *undisputed* fact based on the recollections of Cole and Rehfeldt.[12, 13]

ABB/CM's lack of factual support with respect to the delay issue is not fatal. Because the defendant/infringer must prove *both* unreasonable delay and material prejudice, the Court must consider whether Fanuc has been materially prejudiced.[14]

### C. Material Prejudice

■ Material Prejudice "may be either economic or evidentiary". *Aukerman* at 1033, citing *Cornetta v. United States*, 851 F.2d 1372, 1378 (Fed.Cir.1988) (en banc). As with the element of delay, material prejudice is presumed and ABB/CM bears the burden of production. ABB/CM have argued that material prejudice is "utterly missing" with respect to both laches and estoppel. (ABB/CM's Cross Motion at 3) A showing of *either* evidentiary or economic prejudice constitutes material prejudice. *Id.*

---

**11.** Donald S. Chissum, Patents, A Treatise on the Law of Patentability, and Infringement § 19.05 (Vol. 5 Matthew Bender & Co. 1993).

**12.** Other than the deposition testimony cited above, neither Cole nor Rehfeldt can recall additional reasons why CM failed to file suit. (Exh. 2, Rehfeldt dep., pp. 6–11; Exh. 14, Cole dep., pp 9–11) While the delay might have been due, in part, to CM's conclusion that the P–150 did not infringe, that unresolved issue is not material because it is not a recognized justification for delay.

**13.** While not argued by ABB/CM, delay based on de minimis infringement is not justified by the facts of this case. A patentee may assert such an excuse where the infringer's activities are minor in scope and the patentee has "consistently ex-

pressed" an "intent to demand compensation". *Baker Mfg. Co. v. Whitewater Mfg. Co.*, 430 F.2d 1008, 1014 (7th Cir.1970), *cert. denied*, 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971), citing *Tripp v. United States*, 186 Ct.Cl. 872, 406 F.2d 1066, 1071 (1969). Here, Fanuc's production and sale of the P–150 can not be characterized as de minimis (*See* n. 26) and subsequent to the September 1986 meeting, CM *never* expressed an intent to demand compensation.

**14.** The Federal Circuit's opinion in *Hemstreet* has referred to the presumption as a "double bursting bubble which the plaintiff punctures with introduction of evidence sufficient to raise a genuine dispute as to either delay or prejudice." *Id.* at 1293. If the plaintiff is successful as to either, "[the] defendant is put to its proof on both factors." *Id.*, citing *Aukerman*, 960 F.2d at 1037.

## Evidentiary Prejudice

■ Evidentiary prejudice may arise where the "defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events ..." undermines the court's ability to judge facts. (citations omitted) *Aukerman* at 1033. Fanuc relies solely on the third—the unreliability of memories of long past events.

The Court concludes that ABB/CM have met their burden of production relative to evidentiary prejudice. The evidentiary prejudice which goes directly to the merits of the case concerns losses of memory regarding infringement of the '536 patent. ABB/CM's offering of the Invention Disclosure Statement overcomes the presumption of evidentiary prejudice. "[A] patentee ... eliminate[s] the presumption with an offer of evidence sufficient to place the matters of defense [15] prejudice ... genuinely in issue". *Aukerman* at 1038. Because ABB/CM have met their burden of production, "the presumption evaporates" with respect to evidentiary prejudice. *Id.*

## Economic Prejudice

■ The evidence is now examined with respect to economic prejudice. As *Aukerman* states, "... economic prejudice is not a simple concept but rather is likely to be a slippery issue to resolve." *Id.* at 1033, citing Chissum, § 19.05[2][c].[16] ABB/CM have injected a new question of law not specifically addressed in *Aukerman* by arguing that economic prejudice requires a showing of ***both capital investments for and increasing production of*** the infringing product. (ABB/CM's Reply at 3, citing *Adelberg Laboratories, Inc. v. Miles, Inc.,* 921 F.2d 1267, 1272 (Fed.Cir.1990) ("Making heavy capital investment *and* increasing production can constitute prejudice." (emphasis ours)) ABB/CM refer to this as a "duality of requirements" standard. (ABB/CM's Reply at 3) ABB/CM argue that the simple expansion of Fanuc's sales alone is not sufficient to constitute economic prejudice and therefore Fanuc's defense of laches must fail.

Because the Court finds as a matter of law that *increasing sales [without additional evidence of capital investments] may constitute economic prejudice,* ABB/CM's position is rejected. Support for this holding is found in the language of *Aukerman.* "Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investment *or* incur damages which likely would have been prevented by earlier suit." *Id.* at 1033 (citations omitted) (emphasis added) The second half of this sentence clearly captures increasing sales within the definition of economic prejudice.[17, 18]

Further support for this conclusion is found in Chissum's discussion of the issue of whether "successful expansion" of the infringing activity constitutes economic prejudice. (Chissum at 19.05[2][c] ) While the issue discussed is broader, the analysis is instructive for purposes of this case. For instance, the cases which hold that successful expansion does not constitute economic prejudice do not do so because of an absence of capital investments. Instead, the distinguishing fact in the cases where no economic prejudice is found is that the defendant/infringer would have expanded his business no matter what the patentee "did or did not do". (Chissum at 19–445–56) *Compare, Meyers v.*

---

**15.** The terms "defense" and "evidentiary" prejudice are used interchangeably.

**16.** Before examining the facts and the law with respect to economic prejudice, the Court would note the following passage from Chissum. "As an empirical matter, there seem to be few cases indeed in which a lengthy period of unexcused delay escaped a laches finding because of proof of want of injury."

**17.** Significantly, ABB/CM never do give meaning to the second half of this sentence, treating it, in effect, as surplusage.

**18.** Consider a different *Aukerman* opinion from the Seventh Circuit—*A.C. Aukerman Co. v. Miller Formless Co.,* 693 F.2d 697, 701 (7th Cir.1982). "As to the problem of prejudice to the defendant through the long delay, there is no substantial question. Miller Formless' business continued and expanded while plaintiff was postponing suit." Consider also, *Continental Coatings Corp. v. Metco, Inc.,* 464 F.2d 1375, 1378 (7th Cir. 1972), "As the authorities ... clearly hold, an expansion of the infringer's business is the kind of change of position which will support the defense of laches."

*Brooks Shoe, Inc.,* 912 F.2d 1459, 1463 (Fed. Cir.1990) (The "conclusory affidavits" that Brooks had spent hundreds of thousands of dollars on development and marketing were insufficient because … Brooks' … [the infringer] actions were completely independent of Meyers [the patentee]."); and *Jenn–Air Corp. v. Penn Ventilator Co.,* 464 F.2d 48 (3rd Cir.1972) ("There was no harm to defendant in that, all that happened to it was its continuance of counterfeiting and selling its infringing product."); *with Rome Grader & Machinery Corp. v. J.D. Adams Mfg.,* 135 F.2d 617, 618 (7th Cir.1943) ("Defendant, obviously reasonably believing that Revere had abandoned its charge, continued to manufacture, openly and extensively, the graders complained of and expanded its line of the accused type …").

The Federal Circuit's post *Aukerman* decision in *Hemstreet* removes any doubt as to the nature and focus of an economic prejudice analysis. In *Hemstreet,* despite the defendant's evidence of expenditures of $23 million on research and development, $6.3 million on direct marketing costs, and $20 million to expand or consolidate manufacturing facilities (capital investments), the Federal Circuit reversed and remanded the district court's grant of summary judgment of laches because, "… these expenditures have no explicitly proven nexus to the patentee's delay in filing suit." In addition, the Court noted, "… CES's prejudice argument is severely undercut by Hemstreet's provision of explicit notice … and implicit suggestion that CES would soon face litigation …" *Id.* at 1294. It is clear from *Hemstreet* that the court's inquiry is not whether there is evidence of capital investment. Rather, the key is whether there is a nexus between the delay and the infringer's decision to expand the infringing activity, not the form or number of forms the expansion takes. No economic prejudice can be established if this nexus is absent. "The Courts must look for a *change* in the economic position of the alleged infringer during the period of delay. (citation omitted)" *Aukerman* at 1033 (emphasis in original). "The change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity." *Hemstreet,* 972 F.2d at 1294. Therefore, the infringer's decision to expand his business, whether the expansion took the form of capital investments or increased sales, must consider *what the patentee did or did not do.*

The cases which ABB/CM cite do not stand for the proposition they ask the Court to adopt. Instead, these cases hold that, "[t]he change must be because of and as a result of the delay …". *Hemstreet* at 1294. That some make reference to investments *and* increasing sales (*Adelberg*) is not enough to conclude that there is a "duality of requirements", and the plain language of *Aukerman* does not support such an interpretation.[19] The tenor of the case law suggests that the distinction between investments and increased sales is an artificial one. That an infringer could realize increased sales without a corresponding increase in investment expenditures—capital or otherwise—is unlikely. *Aukerman* and *Adelberg* make clear the scope of inquiry is whether the defendant/infringer changed his position "during the period of delay" and the defendant/infringer had "reason to believe" that the patentee was not going to sue. *The proper focus then should be on the infringer/defendant's reasonable belief that the patentee would not sue. See Universal Coin Lock Co. v. American Sanitary Lock Co.,* 104 F.2d 781, 783 (7th Cir.1939) ("Because of the

---

19. In fact, *Aukerman* focuses only on the volume of sales, "It is not disputed that defendant's conduct changed during the laches time frame both by its manufacturing its own slip-forming device and by greatly increasing the amount of asymmetrical wall it poured. *See supra* n. 3. It could not be inferred against the patentee that these changed circumstances should have been known to the patentee or were immaterial to the determination of laches. Upon the record before us, summary judgment of laches was improperly granted. The issue of laches must be tried." *Id.*

at 1039. (Note 3 indicates that defendant's sales of step wall rose from 3,125 feet to over 62,000 feet. *Id.* at 1027.) What the Court meant by "these changed circumstances should have been known to the patentee" is unclear when considering the elements of a laches defense. Perhaps what the Court meant was that the record was incomplete as to whether the increased sales were "because of and as a result of the delay." Nevertheless, for purposes of the question of law before this Court, the above language is contrary to ABB/CM's argument.

delay, the defendant has good reason to think that plaintiff believes his asserted rights to be worthless."); *Adelberg* at 1271 (The defendant/infringer, "... had reason to believe that [the patentee] was not going to sue for patent infringement.").[20] The policy consideration behind such a requirement is that a defendant/infringer should not be able to claim economic prejudice where he has decided to continue the infringing behavior at his own risk—i.e., without regard to the patentee's behavior. This standard counters the concern raised in *Aukerman* at p. 1033, citing *Jenn–Air Corp. v. Penn Ventilator Co.,* 464 F.2d 48 (3rd Cir.1972) and *Cornetta v. United States,* 851 F.2d 1372 (Fed.Cir.1988) (en banc) that "economic prejudice would arise in every suit."

■ Therefore, economic prejudice is shown by evidence of *either* loss of investment expenditures *or* damages (from increasing sales) which might have been prevented by an earlier suit. However, as *Aukerman* and *Hemstreet* make clear, "such damages or monetary losses" must be, "because of and as a result of" the delay. In order to be "because of and as a result of" the delay, the defendant must have had reason to believe that the patentee did not intend to file suit for infringement.[21]

■ The Court now examines the sufficiency of the evidence produced by ABB/CM to overcome the presumption that the delay has caused economic prejudice to Fanuc. (Is the evidence presented by ABB/CM "sufficient to put the existence of the presumed fact into genuine dispute"? *Aukerman* at 1037) ABB/CM's evidence on the issue of increasing sales is sparse. Indeed, they offer *only argument* that, "even were increased sales evidence of economic prejudice, ... a

mere doubling of sales over five years is not the type of expansion that can constitute economic detriment." (ABB/CM's Cross Motion at 15) However, an examination of Fanuc's Exhibit 19 indicates a tripling of sales during the period of delay.[22] That the sales figures might not reflect a continuously ascending rate does not negate the fact that Fanuc enjoyed a significant expansion in sales of the P–150 during the period of delay. As *Aukerman* holds, economic prejudice may be shown where, "an infringer, if he had notice, could have switched to a noninfringing product." *Id.* at 1033, citing *Rome Grader & Machinery Corp. v. J.D. Adams Mfg. Co.,* 135 F.2d 617, 619 (7th Cir.1943). ABB/CM argue that Fanuc has failed to show that it would have changed to a noninfringing product or that it had reason to believe that ABB/CM did not intend to file suit for infringement. "[D]efendant has submitted nothing by way of hard evidence regarding a noninfringing structure to which it would have shifted." (ABB/CM's Reply at 5) Ignoring for the moment that ABB/CM have the burden of production with respect to this issue, Fanuc has offered evidence on these matters. First, Fanuc offers a 1984 internal memorandum which reflects the halting of production of a robot which it determined might infringe CM's '536 patent. (Exh. 18; Exh. 11, Akeel Aff. ¶ 4) Second, that Fanuc took a license under certain CM control patents during the relevant time period, thereby modifying its behavior to avoid infringement, supports an inference that Fanuc would have done the same with respect to the P–150. Finally, that CM pursued Fanuc with respect to the control patents, but delayed with respect to the '536 patent, supports the reasonableness of Fanuc's belief that CM would not

---

**20.** While reliance is not an element of laches (*Aukerman* at 1042), the infringer's decision to continue or increase production must have some connection to the patentee's delay.

**21.** That there is no duality of requirements is further supported by the Federal Circuit's decision in *Sun Studs, Inc. v. ATA Equipment Leasing, Inc.,* 872 F.2d 978, 993 (Fed.Cir.1989), *vacated in part on reh'g,* 872 F.2d 978 (Fed.Cir. 1989). The Federal Circuit found no error in the following jury instruction, " 'Prejudice' arises

where on account of delay, the alleged infringer made a substantial investment in building up its business *or* where the accused infringer would have avoided the alleged infringing conduct by modifying its business." (emphasis added)

**22.** Pursuant to the Protective Order entered in this case, Exhibit 19 was filed under seal as confidential material. For purposes of this Court's Decision and Order, the sales figures therein reflect a tripling of unit sales of the P–150/P–155 during the period of delay.

file suit.[23] Based on the foregoing, ABB/CM's "argument" that there is no evidence of increasing sales or. evidence that Fanuc would have modified its behavior must be rejected. ABB/CM have failed to offer *evidence* to rebut the presumption of economic prejudice.[24]

Because ABB/CM have not met their burden of production and put forth evidence sufficient to raise a genuine factual issue with respect to either the reasonableness of the delay or the material prejudice to Fanuc as a result of that delay, Fanuc's Motion for Summary Judgment of Laches is granted.[25]

## II.

### ESTOPPEL

 Fanuc has also moved for summary judgment on the grounds of estoppel. "Where equitable estoppel is established, all relief on a claim may be barred." *Aukerman* at 1041. Unlike laches, which focuses on the reasonableness of the plaintiff's behavior, estoppel focuses on what the defendant has been led to reasonably believe from the plaintiff's conduct. *Id.* at 1034. The defendant/infringer must prove: (1) Misleading conduct by the patentee; (2) Reliance upon that conduct; and (3) Material prejudice. "Unlike laches, equitable estoppel does not require the passage of an unreasonable period of time in filing suit." *Id.* at 1042. Accordingly, there is no presumption in an estoppel defense and the burden of production and proof remain at all times with the defendant. *Id.* at 1043. A determination of estoppel is appropriate on summary judgment and bars the patentee's claim for relief in its entirety. *Id.*

### A. MISLEADING CONDUCT OR STATEMENTS

 The patentee's statements and conduct are examined first to determine if they:

* * * communicate something in a misleading way. * * * The 'something' ... is that the accused infringer will not be disturbed by the plaintiff patentee in the activities in which the former is currently engaged. * * * In the most common situation, the patentee specifically objects to the activities as ... infringement ... and then does not follow up for years. * * * There· is ample subsequent precedent that equitable estoppel may arise where, coupled with other factors, a patentee's 'misleading conduct' is essentially misleading *inaction* ... (emphasis in original) (citations omitted) However, plaintiff's inaction must be combined with other facts respecting the relationship or contracts between the parties to give rise to the necessary inference that the claim against the defendant is abandoned. (citations omitted)

*Aukerman* at 1042.

This case represents the "most common situation". As discussed above, CM first requested that Fanuc examine the P–150 in light of the '536 patent at the September 1985 meeting. At approximately the same time,·CM and Fanuc were negotiating with respect to certain CM control patents which resulted in Fanuc taking a license thereunder. By letter dated January 1, 1986, Fanuc reiterated its position that the P–150 did not infringe the '536. (Fanuc's Motion; Exh. 17) Further correspondence took place between CM and Fanuc during the early to middle part of 1986. In September of 1986, CM and Fanuc met to discuss the issue of infringement. Fanuc again asserted its position that the P–150 did not infringe. (Fanuc's Motion; Exh. 15, Syrowik Aff., ¶ 7)

CM took no further action. In fact, following the September, 1986 meeting, no further discussion regarding the '536 patent took place between CM and Fanuc. (Fanuc's Mo-

---

23. A belief made even more reasonable by the knowledge that CM might think twice before suing "one's best customer".

24. While the defendant's conduct is an appropriate factor .to weigh in a laches analysis (*Aukerman* at 1033), ABB/CM have offered no argument or evidence to suggest that Fanuc has acted improperly.

25. "[C]ourts are reluctant to come to aid of a party who has knowingly slept on his rights under circumstances where he might have earlier asserted such rights in the exercise of due diligence." *Lake Caryonah Improv. Assn. v. Pulte Home Corp.*, 903 F.2d 505, 509 (7th Cir.1990).

tion; Exh. 9, Eby Dep. pp. 46–47; Exh. 14, Cole Dep., p. 11) The issue was not raised again until ABB Asea, ABB's parent company, charged Fanuc with infringement in June of 1991. (Fanuc's Motion; Exh. 46) There followed an exchange of correspondence between ABB Asea and Fanuc. Approximately (6) six years and (4) four months after CM knew of the infringing activity (and five years and five months since the date CM admits having had "clear proof" thereof), ABB/CM filed this suit.

Here, as discussed in *Aukerman*, CM's misleading conduct is essentially misleading inaction. CM's inaction, when "combined with the other facts respecting the relationship", supports the Court's conclusion that there are no genuine issues of material fact which preclude the Court from holding that CM's statements and conduct were misleading to the point of giving rise to the necessary inference that CM had abandoned its claim against Fanuc. As discussed below in Part II B, the "other facts" include; (1) CM's objection to the activities as infringing (at the September 1985 meeting) followed by inaction; (2) the relationship between CM and Fanuc's parent, GM [26]; (3) Fanuc's knowledge that CM was not active in the paint spray segment of the market and therefore CM was not losing sales or profits as a result of the alleged infringement of the '536 patent; and (4) the other negotiations which took place between CM and Fanuc with respect to the control patents.

**26.** In fact, GM was CM's largest single robotics customer at that time. (Fanuc's Motion at 21; Exh. 23, Potok Aff., ¶ 4; Exh. 2, Rehfeldt Dep., pp. 6–8; Exh. 14, Cole Dep., p. 10).

**27.** ABB/CM have argued that summary judgment is inappropriate because it has been foreclosed from discovering whether Fanuc relied upon its own counsel in its decision to manufacture and sell the accused device. (ABB/CM's Reply at 10) ABB/CM argue that if Fanuc relied on its own determination that the P–150 did not infringe, it can not now assert an estoppel defense which requires reliance upon the patentee's conduct or statements. To hold that a defendant who believes his device does not infringe, but who also relied upon the inaction of the patentee may not assert the defense of estoppel, is contrary to the principles of equity. ABB/CM is suggesting that only a defendant who chooses to infringe know-

## B. RELIANCE

To satisfy the second element of estoppel, the defendant must show that it, "substantially relied on the misleading conduct of the patentee in connection with taking some action." *Id.* at 1042–43 To show reliance the infringer "must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security ...". Such was the case here. CM's completed negotiations with Fanuc with respect to the control patents, when viewed in light of the abrupt discontinuation in correspondence regarding the '536 patent, gave rise to "the necessary inference" that the claim against Fanuc had been abandoned. That inference is further strengthened because CM had indicated to Fanuc that it would not license the '536. (*See* n. 10) In addition, consider that Fanuc knew CM would have to chose between the enforcement of its patent rights and its business relationship with GM, it's largest single robotics customer. (*See* n. 26) The silence that followed the charge of infringement gave rise to the inference that CM had decided to forgo suing Fanuc in order to maintain its business relationship with Fanuc's parent, GM.[27] ABB/CM argue that CM's silence was "mere silence which, it is well established, is not sufficient to create the requisite intentionally misleading silence ...". (ABB/CM's Cross Motion at 24–26) However, *Aukerman* very specifically holds, "[h]ow one characterizes a patentee's silence is immaterial." *Id.* at 1043. Rather, "the issue ... is whether [CM's] course of con-

ingly may assert the defense of equitable estoppel. ABB/CM's argument is directly contradicted by the Seventh Circuit's opinion in *Continental Coatings Corp. v. Metco, Inc.* 464 F.2d 1375, 1378 (7th Cir.1972): "... Plaintiff argues that Metco was not damaged by IIT's delay ... and that, in any event, it relied on an opinion of invalidity rather than on IIT's inaction as its business expanded.... It is no doubt true that Metco's decision in 1961 to risk litigation rather than to discontinue production was predicated on its opinion that the patent was invalid; but the growth in Metco's business in the ensuing years was permitted to continue without challenge by IIT or plaintiff." Based on the foregoing, even if Fanuc relied, in part, on a determination that its wrist did not infringe the '536 patent, it does not negate its reliance on CM's conduct for purposes of estoppel.

duct reasonably gave rise to an inference that [CM] was not going to enforce the ['536 patent] against [Fanuc]." *Id.*

In addition, ABB/CM argue that CM's silence supports a contrary inference—an inference that CM's silence "represented a continuing threat" that CM's forbearance would last only as long as CM's relationship with GM.[28] (ABB/CM's Cross Motion at 26) While it is true that, "... on summary judgment, such an inference [that the defendant would be unmolested] must be the *only* possible inference" *Aukerman* at 1044 (emphasis in original), the inference that ABB/CM suggest exists under these facts, exists in every case. The patentee's silence always operates as a continuing threat. Instead the focus must be on the "... other facts respecting the relationship ..." in order to determine if the "... patentee's continued silence reinforces the defendant's inference ... that the defendant will be unmolested." *Aukerman* at 1042–44. Consider also, "... the longer the delay, the stronger the inference becomes." *Id.* at 1044. The above facts, when combined with an undisputed delay in excess of five years, suggest that CM had abandoned its claim against Fanuc. In fact, Fanuc cogently argues that CM has admitted its *actual* abandonment of this claim as it "... did not participate in the decision to bring

this action and is not active in this litigation." (Fanuc's Motion at 22–23; Exh. 22, Gregg Dep., p. 9; Exh. 10, Farrell Dep., pp. 21–22) ABB/CM dispute this fact in their Response to Fanuc's Proposed Findings of Fact. (ABB/CM's Responses are attached to their Cross Motion) It does so by referencing the deposition testimony of Stanley L. Pearson. (*Id.* at ¶ 9) According to ABB/CM, Mr. Pearson, at the time employed by ABB Robotics, Inc., placed a call to CM attorney Tom Farrell regarding ABB Robotics' intention to file suit and received his "full blessing". ("He said by all means, you would have Milacron's full blessing, ...") (Pearson Dep., p. 46, attached to ABB/CM's Response to Fanuc's Findings of Fact.) Not only do Mr. Pearson's recollections of what Mr. Farrell said constitute hearsay not properly considered on summary judgment, but Mr. Farrell's own deposition testimony (offered by Fanuc) suggests that CM played little, if any, role in the decision to bring this suit.[29]

The only possible inference that can be drawn from the evidence in this case is that CM would leave Fanuc unmolested. It is immaterial whether that inference is based upon Fanuc's belief that CM didn't want to sue its best customer or Fanuc's belief that CM had decided the P–150 did not infringe.

---

**28.** While ABB/CM do not cite *Aukerman* for this argument, they could have. In *Aukerman,* the Federal Circuit reversed the District Court's grant of summary judgment. It concluded that the evidence supported an inference other than abandonment. Because the defendant/infringer in *Aukerman* originally was engaged in de minimis infringement, the Court reasoned that an inference could be drawn that the patentee was not abandoning its claim, but rather waiting until a significant increase in the infringing activity before bringing suit. Therefore, "[despite] ... the different inferences which could drawn from the exchange of correspondence, [the court drew an unfavorable inference against the patentee]." That is impermissible on summary judgment. *Id.* at 1044. In *Aukerman,* the defendant wrote to the patentee and said if you wish to sue for $200–300 a year, go ahead. This type of correspondence supports the inference that the defendant might have believed the delay was of a temporary nature and not an abandonment of the claim. Here, while CM's relationship with GM could have ended, this is not the only ground upon which Fanuc believed CM had abandoned its rights. Further, there is no correspondence (as in *Aukerman* ) from either party which sug-

gests that CM's delay was based upon CM's relationship with GM. Rather, it is one of many factors which, in light of CM's silence, supported Fanuc's belief that CM had abandoned its rights against it.

**29.** The following excerpts from Mr. Farrell's deposition describe CM's involvement in the case:

p. 21
Q. You don't know any of the issues [in the case]?
A. No.
Q. —or what the positions are of either party?
A. No. I have a copy of the complaint and the answer and they are all on file. It started at that point.
p. 22
Q. Do you get copies of all the pleadings, as you know?
A. As far as I know, I do.
Q. Do you read them?
A. * * * I can't say we've read them in any depth ...
Q. So you don't make any effort to keep pace with the case?
A. No, Sir.

Either belief supports the only possible inference—that CM would not assert its rights under the '536 against Fanuc.

## C. MATERIAL PREJUDICE

The third element of a successful estoppel defense is that the defendant must establish that he would be materially prejudiced if the patentee is now permitted to proceed. "As with laches, the prejudice may be a change of economic position or loss of evidence." *Aukerman* at 1043.[30] As discussed in Section I. C, economic prejudice may be demonstrated by evidence of either loss of monetary investments or the possibility of damages which likely would have been prevented by earlier suit, i.e., the successful expansion of the infringer's business including increased sales. That section focused on ABB/CM's inability to put forth evidence sufficient to overcome the presumption of laches. As there is no such presumption here, an examination of Fanuc's evidence with respect to estoppel is necessary.

### *Economic Prejudice*

After Fanuc exhibited the P–150 in June of 1985, and denied CM's charge of infringement at the September 1985 meeting, its sales of the P–150 and the P–155[31] robots totaled millions of dollars. (Fanuc's Motion at 26; Exh. 29) Expenditures which Fanuc made included: (1) the costs of prosecuting the '580 patent covering the wrist utilized in the P–150/P–155 (Exh. 11, Akeel Aff., ¶ 8); (2) development of the P–155 (Exh. 11, Akeel Aff. ¶ 6); (3) costs associated with procuring additional patents covering other aspects of the P–150/P–155 (Exh. 11, Akeel Aff., p 9; Exhibits 24–28, U.S. Patent Nos. 4,630,567; 4,659,279; 4,659,280; 4,780,045; and 4,807,-486) ABB/CM have objected to this evidence as insufficient to constitute the necessary "irretrievable investment expenditures" such as research and development or increased manufacturing facilities. (ABB/CM's Cross Motion at 16) Even if the Court were convinced that Fanuc has not produced evidence of investment expenditures, ABB/CM cannot

dispute that Fanuc's sales of the P–150/P–155 expanded dramatically. Therefore to proceed with this suit would result in "damages which likely would have been prevented by an earlier suit." *Aukerman* at 1033. In addition, as discussed in Section I. C, the expansion of the allegedly infringing activity was "because of and as a result of" the delay. Based on the foregoing, there is no genuine issue of material fact with respect to the issue of material prejudice.

While the Court has concluded that Fanuc has established the three elements of estoppel, it may also, ". . . take into consideration any other evidence and facts respecting the equities of the parties in exercising its discretion . . .". *Aukerman* at 1043. With that in mind, Fanuc has requested the Court to consider the circumstances under which this case was brought. It has argued that neither CM (the patent holder) nor ABB (the exclusive licensee) are the real parties in interest. Instead, Fanuc argues that ABB Asea and ABB Sweden directed ABB/CM to file suit to protect other subsidiaries which are involved in direct competition with Fanuc. The evidence does support Fanuc's argument that neither ABB nor CM instigated this litigation. (Exh. 10, Farrell Dep., pp. 7, 21–22; Exh. 30, Corwin Dep., pp. 45–46) Further support for this conclusion is that the '536 patent was never raised until after Fanuc began its own enforcement efforts in Europe against various subsidiaries of ABB Asea. As *Aukerman* permits, the Court may consider these facts in examining the defense of equitable estoppel. In doing so, they only lend further support to the conclusion that ABB/CM should be estopped from asserting their rights under the '536 patent against Fanuc.

The evidence presented on the issues of laches and estoppel is such that, "if the case were tried tomorrow", [ABB/CM] would [not] have a fair chance of obtaining a verdict." (*Palucki, supra* at 1573–74). Fanuc is enti-

---

**30.** The Court incorporates by reference its discussion of evidentiary prejudice in Section I. C (pp. 16–17).

**31.** Both the P–150 and the P–155 robots utilize the wrist accused of infringing the '533 patent.

tled to summary judgment with respect to both laches and estoppel.[32]

NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

1. Defendant GMFanuc Robotics' Motion for Summary Judgment of Laches and Estoppel is Granted; and

2. Case No. 92–C–58 is Dismissed with Prejudice.

SO ORDERED,

---

32. The dismissal of Case No. 92–C–58 renders moot any and all remaining motions.